******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

CECIL GRANT *v.* COMMISSIONER
OF CORRECTION
(AC 45569)

Prescott, Cradle and Suarez, Js.*

*Syllabus*

The petitioner, who had been convicted of the crimes of conspiracy to
commit robbery in the first degree, attempt to commit robbery in the
first degree and assault in the first degree, sought a writ of habeas
corpus. He claimed, inter alia, that his criminal trial counsel, C, had
provided ineffective assistance by failing to present testimony from
potential alibi witnesses and an expert in eyewitness identification evi-
dence, as well as by failing to investigate certain cell phone records.
The petitioner and N had been at D's apartment, where the petitioner,
who was armed with a revolver, used D's cell phone at about midnight
to order a pizza delivery. The victim, the delivery driver, called the
phone number on the order slip and was given directions to D's apart-
ment. When the victim arrived, she was met outside by N and the
petitioner, who brandished the revolver and shot at her as she tried to
drive away. D and the victim identified photos of the petitioner and N
from photographic arrays they were shown by the police. At the petition-
er's criminal trial, conflicting evidence was presented as to whether the
petitioner had used D's phone to order pizza. C presented an alibi defense
that was based on the testimony of the petitioner and V, who stated
that V and her two children had driven the petitioner to his home and
dropped him off there about one hour prior to the attempted robbery
and shooting of the victim. This court upheld the petitioner's conviction
on direct appeal. At the habeas trial, C testified that she did not present
testimony from an eyewitness identification expert because the available
science behind the reliability of such evidence at the time of the criminal
trial was relatively new, and the testimony of such an expert would
typically not have been admissible at trial. C also testified that she did
not investigate D's cell phone records because she already had evidence
that his phone had been used to call the pizza establishment, and she
feared that the phone records might contain information that would be
harmful to the defense. C further stated that she did not investigate V's
children as potential alibi witnesses because they would have provided
the same evidence as did V and that calling minors to testify could have
a potential negative impact on the jury. The habeas court rendered
judgment denying the habeas petition, from which the petitioner, on
the granting of certification, appealed to this court. *Held*:

---

* The listing of judges reflects their seniority status on this court as of
the date of oral argument.

1. The petitioner could not prevail on his claim that his right to due process was violated because the eyewitness identification evidence presented at his criminal trial was not reliable and the jury instructions on eyewitness identification testimony were inadequate:

a. The habeas court did not err in rejecting the petitioner's challenge to the eyewitness identification evidence, which this court had rejected in his direct appeal from his conviction; the petitioner's claim pertaining to that evidence was not a freestanding due process claim but, rather, was based exclusively on his ineffective assistance of counsel claim, and, although the petitioner contended that those claims were inextricably intertwined because C had failed to create or preserve a record showing that the eyewitness identification evidence was unreliable and unduly suggestive, the petitioner failed to articulate any distinction between his due process claim and his ineffective assistance claim.

b. This court was unable to review the petitioner's claim regarding the trial court's jury instructions on eyewitness identification evidence, as he failed to challenge the habeas court's conclusion that his claim was procedurally defaulted, which was the basis for the court's rejection of his jury instruction claim.

2. The habeas court properly determined that the petitioner failed to establish that C had rendered ineffective assistance:

a. C's decision not to consult with or present testimony from an eyewitness identification expert was reasonable and did not constitute deficient performance, as it was not inconsistent with controlling law at the time of the petitioner's criminal trial, which disfavored such testimony as invading the province of the jury to evaluate eyewitness testimony and held that the reliability of eyewitness identification evidence was within the knowledge of jurors, who generally would not be assisted by such testimony in considering that evidence.

b. Although the habeas court erred in determining that C's decision not to investigate D's cell phone records was sound trial strategy, the petitioner did not prove that C's failure to do so was prejudicial to him, as he could not establish that the result of his criminal trial would have been more favorable to him had C investigated the records: the petitioner overstated the benefit, if any, that may have inured to his defense had the phone records been introduced into evidence at his criminal trial, as it would be speculative to posit that the records likely would have caused the jury to doubt all of D's testimony, most of which was corroborated by the victim, who identified the petitioner and N as having been involved in the attempted robbery and assault; moreover, although the conflicting evidence as to the phone records may have caused the jury to doubt a portion of D's testimony, the jury reasonably could have credited D's testimony that the petitioner was at the delivery location shortly before the attempted robbery and shooting, that the petitioner and N were planning to rob a delivery driver and that the petitioner was carrying a revolver, all of which the victim's testimony corroborated

and none of which the phone records would have directly challenged; furthermore, in light of the infirmities in the petitioner's credibility, it was not a foregone conclusion that the jurors would have credited his testimony, as he claimed, even if they disbelieved the entirety of D's testimony, as the petitioner's testimony at his criminal trial that he had not previously been involved in gun play was contradicted by his admission that he had been shot less than six months prior to the incident at issue and had been involved in an armed robbery.

c. The evidence at the habeas trial supported C's decision not to present V's teenage children as alibi witnesses at the petitioner's criminal trial: although C should have met with and interviewed the children to determine if their testimony would be beneficial, C's explanation that their testimony would have been cumulative of V's testimony was reinforced when V's daughter testified at the habeas trial, as did V at the criminal trial, that she, her brother and V had dropped the petitioner off at his home about one hour prior to the shooting; moreover, even if this court assumed the veracity of the testimony of V and her daughter, that testimony did not establish an alibi for the petitioner, as neither V nor her daughter could account for his whereabouts at the time the shooting occurred, and, based on the testimony of the petitioner, V and V's daughter that it took about fifteen minutes to get to the petitioner's home from the shooting scene, the petitioner could have returned there before midnight when the shooting occurred; accordingly, because the testimony of V's daughter was, at best, cumulative of V's testimony, it was unlikely that the alibi testimony of V and her daughter would have changed the outcome of the petitioner's criminal trial.

3. This court found unavailing the petitioner's claim that the habeas court arbitrarily rejected the testimony of his expert witnesses because it provided no rationale as to why it did not consider or analyze their testimony in its memorandum of decision denying the habeas petition: in the absence of an explicit rejection of the experts' testimony by the habeas court, this court could not conclude that their testimony had been rejected or, if it was, that such a rejection was arbitrary; moreover, this court presumed that the habeas court properly weighed all the evidence in reaching its decision, and the fact that the habeas court came to a conclusion that was inconsistent with the experts' testimony did not support the petitioner's contention that the court arbitrarily disregarded that testimony.

(*One judge concurring in part and dissenting in part*)

Argued September 19, 2023—officially released April 23, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the petition was withdrawn in part;

thereafter, the case was tried to the court, *M. Murphy, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Evan Parzych*, assistant public defender, with whom, on the brief, was *Katharine S. Goodbody*, assistant public defender, for the appellant (petitioner).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Donna Fusco*, deputy assistant state's attorney, for the appellee (respondent).

*Charles D. Ray* and *Justyn P. Stokely* filed a brief for The Innocence Project as amicus curiae.

*Opinion*

CRADLE, J. The petitioner, Cecil Grant, appeals following the granting of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus, in which he alleged due process violations and ineffective assistance of counsel. On appeal, the petitioner claims that the habeas court improperly (1) concluded that the eyewitness identification evidence presented at his criminal trial did not violate his due process rights; (2) concluded that he had not established that his trial counsel was ineffective for having failed to consult with or offer the testimony of an eyewitness identification expert, for having failed to investigate the issue of phone calls the petitioner allegedly made from a witness' cell phone immediately prior to the crime, and for having failed to investigate and to present potential alibi witness testimony; and (3) declined to credit the testimony of two expert witnesses at the habeas trial. We affirm the judgment of the habeas court.

The following facts, as set forth by this court in upholding the petitioner's conviction on direct appeal,

and procedural history are relevant to our resolution of the petitioner's claims. "At approximately 10 p.m. on April 30, 2011, the [petitioner] and two other individuals, Derek Newkirk and Mike Anderson, were visiting with Gustin Douglas at Douglas' apartment at . . . Mary Shepard Place in Hartford. The [petitioner] and Newkirk told Douglas that they needed money, and the group discussed restaurants in the area that might have delivery persons who retained payments between deliveries. The [petitioner] used Douglas' cell phone to order a pizza from Pizza 101 on Albany Avenue in Hartford. While waiting for the delivery person to arrive, the [petitioner] displayed a revolver, waving it around and passing it between himself and Newkirk before putting it into the pocket of his hooded sweatshirt. Newkirk and the [petitioner] went outside to meet the delivery driver; Douglas and Anderson remained inside.

"At approximately 11 p.m., the victim, a delivery person for Pizza 101, was dispatched to make a delivery to . . . Mary Shepard Place. She initially had trouble finding the address. She called the [phone] number indicated on the order slip, and a man answered and provided her with directions. When she arrived at the address, the [petitioner] approached the front passenger door of the victim's vehicle. Newkirk stood near the [petitioner]. Both men's faces were uncovered and clearly visible to the victim. The [petitioner] spoke with the victim through the open passenger side window, asking her several times if she had change; the victim responded each time that she did not. The [petitioner] then displayed a revolver, which he placed against the passenger door, stating, '[W]ell, gimme this.' Simultaneously, the [petitioner] attempted to open the front passenger door but was unable to do so.

"After seeing the [petitioner] holding the revolver, the victim started to drive away, at which time the [petitioner] began shooting. Five bullets entered the

car, striking the victim in the neck, chin, shoulder and arm. Because Mary Shepard Place is a dead-end street, the victim had to turn her vehicle around and pass by the [petitioner] and Newkirk in order to get away. The victim drove herself to a hospital. The [petitioner] and Newkirk returned to Douglas' apartment. Douglas, who had heard the gunshots, observed that the [petitioner] and Newkirk were acting '[l]ike they were nervous' when they returned, but he did not discuss with them what had happened outside.

"The police were dispatched to the hospital, where they photographed and secured the victim's vehicle. A detective later interviewed the victim about the shooting. The victim described her shooter as a black male of light to medium complexion, short hair, skinny build, five feet, six inches tall, between sixteen and seventeen years old, wearing jeans and a black hooded sweatshirt over a shirt with a design on it. The police investigated the cell phone number that the victim had called to obtain directions prior to the shooting, which eventually led them to speak with Douglas. Douglas provided the police with details about his interactions with the [petitioner] and Newkirk on the night of the shooting, which led the police to consider them as suspects. Douglas also identified photographs of the [petitioner] and Newkirk in police photographic arrays. The police later asked the victim to look at photographic arrays, from which the victim was able to identify both the [petitioner] and Newkirk.

"The [petitioner] was arrested and charged with conspiracy to commit robbery in the first degree, attempt to commit robbery in the first degree, and assault in the first degree. [Following a jury trial on May 14, 15 and 18, 2012], [t]he jury found the [petitioner] guilty of all the charges. [On July 13, 2012], [t]he court . . . sentenced the [petitioner] to a total effective term of sixty

years of incarceration, suspended after forty years, followed by five years of probation." *State* v. *Grant,* 154 Conn. App. 293, 296–98, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). At all times during his criminal trial, the petitioner was represented by Attorney Kirstin B. Coffin. Thereafter, the petitioner appealed, and this court affirmed his conviction. See id., 296.

On August 2, 2019, the petitioner filed his operative third amended petition for a writ of habeas corpus in this action, claiming that his due process rights had been violated because (1) "the conviction was based primarily on eyewitness identification evidence now known to be suggestive and/or unreliable . . . [(2)] the jury was deprived of information crucial to its ability to assess the reliability of the identification made by the primary eyewitness, [the victim] . . . [and (3)] the jury instruction regarding eyewitness identification was scientifically unsound."[1] He also claimed that his constitutional right to the effective assistance of counsel had been violated because his trial defense counsel "failed to consult with and/or present an eyewitness identification expert"; "failed to adequately and properly investigate the issue of the phone calls made from . . . Douglas' [phone] on the night of April 30, 2011, to prove or disprove the account provided by . . . Douglas"; and "failed to adequately investigate and/or present witnesses that confirmed that the petitioner was not at . . . Mary Shepard Place during the night of April 30, 2011, including but not necessarily limited to Vanessa . . . Cooper [and her children]."[2]

---

[1] In his return, the respondent, the Commissioner of Correction, alleged that the petitioner's claim regarding the jury instruction on eyewitness identification was procedurally defaulted. The respondent denied or left the petitioner to his proof as to all of the remaining allegations of his petition.

[2] In his third amended petition, the petitioner also claimed that he was actually innocent and that his trial counsel was ineffective in failing to "investigate and properly present a third-party culpability defense"; in failing to "conduct a timely and adequate investigation, including but not limited

Following a trial, the habeas court, *M. Murphy, J.*, issued a memorandum of decision dated April 19, 2022, in which it rejected all of the petitioner's claims and denied his petition. The habeas court thereafter granted the petitioner's petition for certification to appeal to this court. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first claims a violation of his right to due process under the state and federal constitutions. He claims that his right to due process was violated because the eyewitness identification evidence presented at his criminal trial was obtained through the use of unduly suggestive procedures by the police and was not reliable under the totality of the circumstances. The petitioner also claims that the jury instructions on eyewitness identification testimony at trial were "woefully inadequate." We address each of these claims in turn.

A

The petitioner first claims that his right to due process was violated because the eyewitness identification evidence presented at his criminal trial was obtained by unduly suggestive procedures and was not reliable under the totality of the circumstances. Specifically, the petitioner argues that "the habeas court erred in concluding that a conviction based on a single eyewitness identification without [the] benefit of expert testimony does not violate due process." Although the petitioner devotes most of his appellate brief in this regard

to investigating the petitioner's alibi defense, investigating . . . Douglas' involvement, and investigating the physical crime scene"; and in failing to "pursue the testing of DNA evidence or other evidence collected from the victim's automobile." The petitioner explicitly abandoned these additional ineffective assistance of counsel claims in his posttrial brief to the habeas court. As to his claim of actual innocence, the petitioner withdrew it prior to trial.

to discussing the science of eyewitness identification evidence and the factors that courts consider in addressing the reliability of that evidence, the petitioner's appellate counsel acknowledged, at oral argument before this court, that this court on direct appeal had addressed the petitioner's claim that the eyewitness identification of him was unreliable and unduly suggestive. Counsel conceded that he was not arguing that the eyewitness identification cases that were decided following the date of the petitioner's conviction applied retroactively to his case.[3] He clarified that the petitioner's due process claim is "intricately intertwined with the ineffective assistance of counsel claim because the record wasn't sufficiently developed, and there wasn't a sufficient record for challenging that on appeal. . . . The due process claim is inextricably tied into the ineffective assistance . . . and he was deprived of due process because counsel was ineffective and did not preserve or pursue or create a record for the due process claim."

Our Supreme Court has explained that, "[i]n habeas corpus proceedings, courts often describe constitutional claims that are not tethered to a petitioner's sixth amendment right to counsel as freestanding." (Internal quotation marks omitted.) *Saunders* v. *Commissioner of Correction*, 343 Conn. 1, 25–26, 272 A.3d 169 (2022). When pressed, the petitioner's appellate counsel failed to articulate any distinction between the petitioner's

---

[3] Because this court on direct appeal addressed the petitioner's claim that the eyewitness identification of him was unreliable and unduly suggestive, the doctrine of res judicata bars any further consideration of that claim in the absence of an allegation of a new legal ground, new facts or new evidence that was not reasonably available at the time of the petitioner's direct appeal. See *Tatum* v. *Commissioner of Correction*, 211 Conn. App. 42, 49, 272 A.3d 218, cert. granted, 343 Conn. 932, 276 A.3d 975 (2022). When asked at oral argument what had changed since the petitioner's direct appeal as to the due process claim, the petitioner's appellate counsel reiterated his claim that the petitioner's criminal trial counsel had rendered ineffective assistance.

purported freestanding due process claim and his ineffective assistance of counsel claim. In light of appellate counsel's acknowledgement that the due process claim is not, in fact, freestanding but, rather, is based exclusively on the ineffective assistance of counsel claim, we conclude that the habeas court did not err in rejecting the due process claim. See *Sanchez* v. *Commissioner of Correction*, 203 Conn. App. 752, 760–61, 250 A.3d 731 ("[i]t is axiomatic that [w]e may affirm a proper result of the trial court for a different reason" (internal quotation marks omitted)), cert. denied, 336 Conn. 946, 251 A.3d 77 (2021). We will address the petitioner's ineffective assistance of counsel claims in part II of this opinion.

B

The petitioner also claims that his right to due process was violated in that "the jury instructions on eyewitness identification testimony at [his] trial were woefully inadequate." The respondent, the Commissioner of Correction, contends that this claim is not a due process claim, and, even if it were, the habeas court properly determined that it was procedurally defaulted. We agree with the respondent.

The habeas court explained that, in "[t]he petitioner's due process claim, [he] argues that the jury instructions provided at the underlying criminal trial were constitutionally inadequate because they failed to address additional information regarding the science and research behind eyewitness identification . . . . This claim is subject to procedural default and was not raised at a prior proceeding. Therefore, the petitioner must demonstrate good cause as to why the claim was not raised and demonstrate any prejudice resulting therefrom. The petitioner claims that cause and prejudice exist for the default because the claim is premised on [Coffin's] failure to retain and utilize an eyewitness expert, which

led to a limited record for appellate counsel to rely upon. However, the information regarding the science and research behind eyewitness identification was relied upon in the petitioner's appeal where he challenged both the suggestibility of the identification procedures utilized by the police and the reliability of the victim's identification." Noting the principle that "[t]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default," the court concluded that "[t]he petitioner failed to carry his burden of demonstrating good cause for having failed to raise [this] claim directly." (Internal quotation marks omitted.) The court further concluded that "the petitioner failed to show that he suffered actual prejudice as a result by demonstrating that the alleged impropriety worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." (Emphasis omitted; internal quotation marks omitted.) On those bases, the habeas court concluded that this claim was procedurally defaulted.

On appeal, the petitioner argues that, because the jury "did not have the benefit of expert testimony to contextualize [the victim's] identification of [the petitioner] . . . [t]he trial court . . . should have provided comprehensive and focused jury instructions." (Internal quotation marks omitted.) He contends that, "[t]hough the court's instructions included several buzzwords borrowed from the science of eyewitness identification, they provided hardly any additional context or information, and failed to inform the jury of the robust science and research supporting this area of inquiry." He continues at length in his appellate brief as to how and why the jury instructions were deficient.

The petitioner fails, however, to challenge the habeas court's conclusion that his claim pertaining to the jury

instructions was procedurally defaulted. Because the petitioner has failed to challenge the basis on which the court relied in rejecting this claim, we are unable to afford it review. See *U.S. Bank, N.A.* v. *Armijo*, 195 Conn. App. 843, 846, 228 A.3d 131 (2020).

II

The petitioner next claims that the habeas court improperly rejected his claim that his trial counsel, Coffin, rendered ineffective assistance by failing to consult with an eyewitness identification expert or to offer the testimony of such an expert; to investigate the issue of phone calls the petitioner allegedly made from a witness' cell phone immediately prior to the crime; and to investigate and present potential alibi witness testimony. We disagree.

We set forth the well settled standard of review and law related to claims of ineffective assistance of counsel. "It is well established that [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas [court], as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 40–41, 188 A.3d 1 (2018), cert. denied sub nom. *Connecticut* v. *Skakel*, U.S. , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019).

"Under the sixth amendment to the United States constitution, a criminal defendant is guaranteed the right to the effective assistance of counsel. . . . Thus,

because [a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair . . . [t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. . . .

"To determine whether a defendant is entitled to a new trial due to a breakdown in the adversarial process caused by counsel's inadequate representation, we apply the familiar two part test adopted by the court in *Strickland* [v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires [a] showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the [s]ixth [a]mendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Citations omitted; internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 29–30.

To prevail on the first prong, the petitioner "must show that, considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. . . . [J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance

after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . Indeed, our Supreme Court has recognized that [t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Emphasis omitted; internal quotation marks omitted.) *Morales* v. *Commissioner of Correction*, 220 Conn. App. 285, 305–306, 298 A.3d 636, cert. denied, 348 Conn. 915, 303 A.3d 603 (2023).

Furthermore, "[t]he right to the effective assistance of counsel applies no less to the investigative stage of a criminal case than it does to the trial phase." *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 32. Counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In

other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 680, 51 A.3d 948 (2012). "[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. . . . In addition, in contrast to our evaluation of the constitutional adequacy of counsel's strategic decisions, which are entitled to deference, when the issue is whether the investigation *supporting* counsel's [strategic] decision to proceed in a certain manner was itself reasonable . . . we must conduct an objective review of [the reasonableness of counsel's] performance . . . . Thus, deference to counsel's strategic decisions does not excuse an inadequate investigation . . . .

"Although the reasonableness of any particular investigation necessarily depends on the unique facts of any given case . . . counsel has certain baseline investigative responsibilities that must be discharged in every criminal matter. It is the duty of the [defense] lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case . . . .

"Of course, the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste. . . . In other words, counsel is not required to conduct an investigation that promise[s] less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any

needle there." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 32–34. However, "common sense dictates that, when the stakes are highest—when the criminal charges are most serious, exposing the defendant to the most lengthy of prison terms—the importance of a thorough pretrial investigation is that much greater." Id., 53.

To satisfy the prejudice prong, "[t]he defendant must establish . . . that counsel's constitutionally inadequate representation gives rise to a loss of confidence in the verdict. In evaluating such a claim, the ultimate focus of [the] inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results. . . . Of course, a reviewing court does not conduct this inquiry in a vacuum. Rather, the court must consider the totality of the evidence before the judge or jury. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . Furthermore, because our role in examining the state's case against the petitioner is to evaluate the strength of that evidence and not its sufficiency, we do not consider the evidence in the light most favorable to the state. . . . Rather, we are required to undertake an objective review of the nature and strength of the state's case. . . . In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is

possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 38–40. With these principles in mind, we address the petitioner's claims of ineffective assistance of counsel in turn.

A

The petitioner first claims that the habeas court erred in concluding that he had not established that Coffin rendered ineffective assistance when she failed to consult with, or offer the testimony of, an eyewitness identification expert. We are not persuaded.

In rejecting the petitioner's claim, the court recounted Coffin's testimony that "she was aware of the science regarding the reliability of eyewitness identification that was available at that time because she requested a jury instruction on it, but she did not hire or consult with an eyewitness expert . . . [and] that, at the time of the petitioner's case, the science was still relatively new, there was no standard or expectation at that time to call an eyewitness identification expert and such an expert would typically not have been admissible at trial."

The court agreed, explaining that, at the time of the petitioner's criminal trial, "controlling law on the issue of eyewitness identification was *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), in which our Supreme Court remarked that the reliability of eyewitness identification is within the knowledge of jurors and expert testimony generally would not assist them in determining the question. . . . Such testimony is also disfavored because . . . it invades the province

of the jury to determine what weight or effect it wishes to give to eyewitness testimony. (Citation omitted; internal quotation marks omitted.) Id., 477." The habeas court explained that it was not until "[a]fter the petitioner's criminal trial [that] our Supreme Court decided *Guilbert*, which overruled *Kemp*, holding that *Kemp* was out of step with the widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror." (Internal quotation marks omitted.)

The court concluded that the petitioner had failed to prove that Coffin "performed deficiently by failing to present an expert on the issue of eyewitness identification because the law in effect at the time of the petitioner's criminal trial discouraged the use of such expert testimony." The court further concluded that the petitioner had not "proven that the jury in his case would have found the victim's identification to have been unreliable and thus failed to establish . . . a reasonable probability . . . that the outcome of the proceedings would have been different had the jury heard such expert testimony."

On appeal, the petitioner argues that Coffin's decision not to consult with or offer the testimony of an eyewitness identification expert was not a reasonable and informed strategic decision made after a thorough investigation of the law and facts but, instead, was merely "based on her lack of knowledge regarding the admissibility of eyewitness identification expert testimony . . . ." In so arguing, the petitioner ignores the fact that, at the time of his criminal trial, *Kemp*, which held that expert testimony generally would not assist a jury in considering eyewitness identification evidence, was the controlling law in Connecticut.

Because Coffin's decision not to consult with or present the testimony of an eyewitness expert was not

inconsistent with the law at the time of the petitioner's trial, we agree with the habeas court's determination that her decision was reasonable. See *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 462, 880 A.2d 160 (2005) (counsel "performs effectively when he elects to maneuver within the existing law" (internal quotation marks omitted)), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). We, therefore, conclude that the habeas court properly determined that the petitioner had not established deficient performance by Coffin regarding her failure to consult with or offer the testimony of an eyewitness identification expert.[4]

B

The petitioner also claims that the habeas court erred in concluding that he had not established that Coffin rendered ineffective assistance by failing to investigate the issue of phone calls the petitioner allegedly made from Douglas' cell phone immediately prior to the attempted robbery and assault. We agree that the habeas court erred in determining that Coffin's performance was not deficient in this regard but nonetheless conclude that the petitioner was not prejudiced by Coffin's deficient performance.

In the petitioner's third amended petition for a writ of habeas corpus, he claimed that Coffin's deficient performance violated his constitutional right to the effective assistance of counsel when she failed "to adequately and properly investigate the issue of the phone calls made from . . . Douglas' [phone] on the night of

---

[4] Because we affirm the habeas court's determination that the petitioner failed to prove that Coffin's performance was deficient in not presenting testimony from an eyewitness identification expert, we need not also address the petitioner's challenge to the court's determination that he failed to prove prejudice.

April 30, 2011, to prove or disprove the account provided by . . . Douglas," and that "[t]here is a reasonable probability that—but for . . . counsel's deficient performance . . . the result of the petitioner's criminal trial would have been . . . more favorable to the petitioner."

At the habeas trial, the petitioner offered into evidence the criminal trial transcripts, which included the testimony of Detective William J. Siemionko of the Hartford Police Department. Siemionko had testified at the petitioner's criminal trial that, shortly after the shooting, he obtained Douglas' phone records to determine who owned the phone associated with the phone number on the pizza order slip. Although the state did not offer those records into evidence, Siemionko testified that someone using Douglas' phone "did call Pizza 101 prior to the pizza deliver[y] by [the victim]" and that it had received a phone call from the victim at 12:02 a.m. on May 1, 2011, from the victim's phone.

At the habeas trial, the petitioner also presented the testimony of Michael Udvardy, a private investigator who had reviewed the phone records in the state's file, and offered into evidence Udvardy's report, which was based on his analysis of those phone records. Udvardy testified, and stated in his report, that his analysis of Douglas' phone records revealed that someone using Douglas' phone probably did not call Pizza 101. He also testified that there was a gap in the usage of Douglas' phone at the time the shooting likely took place, but that he "wouldn't be alarmed by" the usage gap.

Another witness for the petitioner at his habeas trial, Brian S. Carlow, a former Deputy Chief Public Defender, testified that reasonably effective trial counsel "would want to examine the cell phone records to see whether or not what . . . Douglas was testifying to and what he had previously said in statements is

either supported by those records or refuted by [them]." As to the usage gap, he characterized it as evidence that would have been "interesting to point out to a jury" but conceded that one reason for the usage gap might have been because Douglas "just simply wasn't coincidentally making any phone calls during that period of time."

Coffin testified that one of her trial defense strategies had been a third-party culpability defense directed at Douglas. She also testified that, at the time of the petitioner's criminal trial, the state had an open file policy but that she had not reviewed Douglas' phone records for fear of harm they might cause the defense and because she already had evidence that Douglas' phone had called the pizza place.[5]

The habeas court found that the petitioner had failed to sustain his burden of proving that Coffin provided

---

[5] The following colloquy took place during the habeas trial between the petitioner's habeas counsel, Attorney Katharine S. Goodbody, and Coffin:

"[Goodbody]: . . . [S]o, you didn't review the phone records?

"[Coffin]: Right.

"[Goodbody]: Did you consider offering the phone records at trial?

"[Coffin]: . . . [N]o. I'm a little [wary] in general of offering phone records.

"[Goodbody]: And why is that?

"[Coffin]: Sometimes phone records can prove to be dangerous. Once you offer phone records, the state can get all of the records, and those could sometimes—I've had cases before where I've offered phone records, and the state has brought in more phone records and it turned out that it backfired.

"[Goodbody]: . . . [B]ut you didn't even review the phone records here, did you?

"[Coffin]: I don't believe so, no.

"[Goodbody]: Did you consider hiring someone to review the phone records?

"[Coffin]: No, I don't think so.

"[Goodbody]: And why would you not do that?

"[Coffin]: I think the call was—we did have the evidence that the call was made from . . . Douglas' phone, and I think I was just sticking with that. I didn't want any other phone records to come in that could wind up hurting our defense.

"[Goodbody]: Were you aware of any other phone records?

"[Coffin]: No."

ineffective assistance of counsel as to the phone records. The court recounted that "Coffin testified at the habeas trial that she is generally wary of offering [phone] records as exhibits at trial because the state can then receive all the records, which can ultimately backfire and harm the defense. . . . Coffin further testified that it was her strategic decision to not delve further into Douglas' [phone] records for concern of what they could have revealed, particularly because she already had the evidence presented that the call was made to the pizza shop from Douglas' cell phone, and she cross-examined him on that fact at trial.

"Considering the presumption the court must take that counsel's conduct fell within a wide range of professional assistance, the petitioner has not proven that . . . Coffin's handling of the [phone] records was not sound trial strategy. Furthermore, the petitioner has not proven that he was prejudiced thereby by demonstrating that Douglas' phone records provided any evidence that would have assisted in his defense and created a reasonable probability that the outcome of the case would have been different had they been further investigated or presented into evidence. As a result, this claim must be denied."

On appeal, the petitioner claims that the habeas court erred in concluding that Coffin's decision not to investigate the phone records was sound trial strategy. We agree. A reasonably competent defense attorney should want to know all of the evidence relating to the case—inculpatory and exculpatory—in order to make sound strategic decisions and effectively represent the client, including whether to advise the client to accept a plea offer. A fear of discovering evidence that might harm the client is not a proper basis for neglecting to investigate. Moreover, the record reflects that the state was in possession of Douglas' phone records, and, thus, any potentially inculpatory evidence was already in the state's

possession. Coffin's concern as to the potential harmfulness was certainly a reason *to* review that evidence, and her failure to do so was deficient. See *Skakel* v. *Commissioner of Correction,* supra, 329 Conn. 35 ("counsel's anticipation of what . . . potential [evidence] would [show] does not excuse the failure to find out; speculation cannot substitute for certainty" (internal quotation marks omitted)).

That does not, however, end our inquiry. As stated herein, to prevail on an ineffective assistance of counsel claim, a petitioner must prove both deficient performance and prejudice. As to prejudice, the petitioner notes that Douglas testified that "his cell phone was used by [the petitioner] to call multiple places to find someone to rob. . . . [The petitioner] testified that he did not do this." (Citation omitted.) The petitioner argues on appeal that "[a] simple review of [Douglas' phone] records would have shown that . . . Douglas was lying about what had occurred that evening. . . . It would have supported . . . [the petitioner's] testimony." (Citation omitted.) The petitioner contends that "[t]he [phone] records reveal that . . . Douglas' phone never [was used to call the victim's] phone or Pizza 101. . . . They further reveal [that someone using the victim's] phone called . . . Douglas' phone once on the night of the incident. . . . Further, during the late evening of April 30, 2011, and the early morning of May 1, 2011, all the calls shown on . . . Douglas' phone records show that, other than the call from [the victim's] phone, they were to other mobile phones, and these numbers appear on his bill in various other spots and times . . . [a]nd [n]one of these other numbers were associated with Pizza 101 or with any business establishment. . . . This would prove to the jury that Douglas' phone was never used to call Pizza 101, as he testified. Additionally, there was a gap in usage on . . . Douglas' cell phone from 12:02 to 12:15 [a.m. on May

1, 2011]. . . . During that time, [t]here were some incoming . . . [b]ut there [were] no outgoing calls or texts." (Citations omitted; footnote omitted; internal quotation marks omitted.) The petitioner argues that Douglas' phone records in the present case represent neutral evidence that could have resolved conflicting testimony at the criminal trial. We disagree.

Although Douglas' phone records may have shown that Douglas' phone was not used to call multiple places to find a target or to call Pizza 101, they do not contradict the incriminating evidence that Douglas' phone number was given to Pizza 101 when the order was placed. Furthermore, the phone records bolster the evidence that the victim called Douglas' phone to get delivery directions, a fact that was also substantiated by Douglas' own testimony. Indeed, as the respondent argues, the fact that Douglas' phone apparently was not used preliminarily to call pizza restaurants or to place the order with Pizza 101 might reasonably suggest that the petitioner used his own phone to make those calls and gave Douglas' number to Pizza 101 when he placed the order in an attempt to avoid leaving a record of his involvement. Thus, although the discrepancy between the phone records and Douglas' testimony may have caused the jury to doubt a portion of his testimony, it would be speculative to posit that it would have been likely to cause the jury to doubt all of his testimony, most of which was corroborated by the victim, who identified the petitioner and Newkirk as having been involved in the attempted robbery and assault. The jury reasonably could have credited Douglas' testimony that the petitioner was at Mary Shepard Place shortly before the victim was shot, that the petitioner and Newkirk were making specific plans to rob a delivery driver, and that the petitioner had a revolver that he was carrying in the pocket of his hooded sweatshirt. None of that

incriminating testimony would have been directly challenged by the introduction of the phone records. Again, that evidence was corroborated by the victim's account[6] of the attempted robbery and assault that occurred, which also implicated the petitioner and Newkirk.[7] Thus, we are persuaded that the petitioner greatly overstates the benefit, *if any*, that may have inured to the defense if the phone records had been introduced at his criminal trial.

The petitioner's argument that the phone records would have caused the jury to credit his testimony as to the events of the evening in question is also speculative. Although the petitioner testified at his criminal trial that he never had a gun and that he had not been involved in gun play before, he admitted that he had been shot four times in November, 2010. The court also permitted the state to ask the petitioner about prior misconduct, specifically, an armed robbery during which the petitioner allegedly staked out a liquor store in the area and asked the cashier if he had change before robbing him at gunpoint. In light of these infirmities with the petitioner's credibility, it is not a foregone conclusion that, even if the jurors had disbelieved the entirety of Douglas' testimony, they would have credited the petitioner's testimony.

---

[6] We note that the victim's initial interaction with the petitioner did not involve the stress of having a gun drawn on her. Initially, when the victim arrived to deliver the pizza, the petitioner approached the passenger side window of the victim's vehicle and asked her if she had change. When she told the petitioner that she did not have change, he asked Newkirk if he had change. After Newkirk told the petitioner that he did not have change, the petitioner again asked the victim if she had change, the victim told him that she did not and then something fell out of the petitioner's pocket. The petitioner picked up the object and put it into his pocket, and the victim did not think anything of it. The petitioner continued to ask the victim for change and when she told him that she did not have change, he then put the gun to the door of the vehicle, and the victim saw it for the first time.

[7] The petitioner testified at trial that he saw Newkirk when he first arrived at Mary Shepard Place that evening.

As this court noted in its consideration of the petitioner's direct appeal, the cross corroboration of the testimony of Douglas and the victim presented a strong case against the petitioner. *State* v. *Grant*, supra, 154 Conn. App. 328–29. We reiterate that, to prove prejudice under *Strickland*, the petitioner must demonstrate that, in the absence of the deficient performance at issue, the likelihood of a different result must be substantial, not just conceivable. "[T]he petitioner must meet this burden not by use of speculation but by demonstrable realities." (Internal quotation marks omitted.) *Madera* v. *Commissioner of Correction*, 221 Conn. App. 546, 556, 302 A.3d 910, cert. denied, 348 Conn. 928, 305 A.3d 265 (2023). We agree with the habeas court that the petitioner failed to meet this burden.

On the basis of the foregoing, we conclude that the habeas court properly concluded that the petitioner had failed to demonstrate that Coffin provided ineffective assistance as to her handling of Douglas' phone records.

C

The petitioner also claims that the habeas court erred in concluding that he had not established that Coffin rendered ineffective assistance by failing to investigate, prepare and present potential alibi witnesses. We disagree.

In the petitioner's third amended petition for a writ of habeas corpus, he claimed that Coffin's deficient performance violated his constitutional right to the effective assistance of counsel when she failed "to adequately investigate and/or present witnesses that confirm that the petitioner was not at . . . Mary Shepard Place . . . during the night of April 30, 2011, including, but not necessarily limited to Vanessa . . . and/or [her children]," and that, "[t]here is a reasonable probability that—but for . . . counsel's deficient performance

. . . the result of the petitioner's criminal trial would have been . . . more favorable to the petitioner.''

In rejecting this claim of ineffective assistance, the habeas court recounted that ''Coffin testified at the habeas trial that, when she was appointed as the petitioner's counsel, she reviewed the police reports, met with the petitioner, and hired an investigator who examined the scene and met with potential witnesses. [She] testified that she presented an alibi defense to the jury using testimony by [Cooper] and the petitioner. [She] also testified that her decision not to call additional alibi witnesses, such as Cooper's children . . . was strategic because she avoids calling minors to testify if possible due to a potential negative impact on the jury. She further testified that Cooper's children would have provided the same evidence as Cooper, and she believed that the strategic decisions she made at the time accompanied by Cooper's testimony would be enough for a successful alibi defense.'' The habeas court concluded that, ''[c]onsidering the presumption the court must take that counsel's conduct fell within a wide range of professional assistance, the petitioner has not proven that . . . Coffin's investigation into and presentation of the petitioner's alibi defense failed to constitute sound trial strategy. Furthermore, the petitioner has not proven that he was prejudiced thereby by demonstrating that the additional testimony provided evidence that would have . . . created a reasonable probability that the outcome of the case would have been different had the witnesses been called to testify at the criminal trial.''

On appeal, the petitioner asserts that Coffin's decision not to investigate Cooper's children as potential alibi witnesses was unreasonable because ''presenting [the petitioner's] alibi was clearly part of her defense.'' Second, the petitioner contends that Coffin's reasoning

"does not stand up to scrutiny" because Cooper's children were teenagers—not young children—and they had important information to establish the defense Coffin was presenting; therefore, "[t]here would be no reason not to put them on [the witness stand] to support that defense." Furthermore, he argues that, even if Coffin's decision was strategic, "the strategy was neither reasonable nor informed" because Coffin had not even investigated the witnesses despite her knowledge of their existence.

Although we agree with the petitioner that Coffin should have, at a minimum, met with and interviewed Cooper's children to ascertain the potential benefit, if any, to having them testify on the petitioner's behalf, the evidence presented at the habeas trial supports Coffin's explanation that their testimony would have been cumulative of Cooper's testimony that she and her son and daughter had dropped the petitioner off at his home before 11 p.m. At the habeas trial, Cooper's daughter testified that they had dropped the petitioner off at his home between 9 and 10 p.m. and that the petitioner "was home by 11 p.m., I know." Even if we assume the veracity of the alibi testimony of both Cooper and her daughter, that testimony did not establish an alibi for the petitioner because the shooting occurred sometime between midnight and 12:15 a.m. Neither Cooper nor her daughter could account for the petitioner's whereabouts at the time the shooting occurred. Based on the testimony of the petitioner, Cooper and Cooper's daughter that it took approximately fifteen minutes to get to the petitioner's home from Mary Shepard Place, the petitioner could have returned to Mary Shepard Place before midnight. Because the testimony of Cooper's daughter was, at best, cumulative of Cooper's testimony and did not provide the petitioner with an alibi for the time during which the shooting occurred, it is unlikely that the testimony of Cooper's daughter

would have changed the outcome of the petitioner's trial. See *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 629, 212 A.3d 678 (2019) ("an alibi witness' testimony has been found unhelpful . . . when the proffered witness would fail to account sufficiently for a defendant's location during the time or period in question" (internal quotation marks omitted)). Accordingly, the habeas court did not err in concluding that the petitioner did not establish that Coffin had rendered ineffective assistance by failing to investigate, prepare and present potential alibi witnesses.

## III

Finally, we turn to the petitioner's claim that "[t]here was no legitimate basis on the record for the habeas court's rejection of the unrebutted expert testimony of . . . [Margaret Bull] Kovera [concerning eyewitness identification testimony] and . . . Carlow." The petitioner argues that the habeas court arbitrarily rejected the testimony of both Kovera and Carlow when it gave no rationale for why it did not consider or analyze their testimony. We are not persuaded.

"[A] trier of fact may accept or reject, in whole or in part, the testimony of an expert offered by one party. . . . This principle holds true even when the opposing party offers no rebuttal expert. . . . [I]n its consideration of the testimony of an expert witness, the [trier of fact] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the [person being examined] and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions [that] he drew from them. . . . Thus, it is permissible for the trier of fact to entirely reject uncontradicted expert testimony as not worthy of belief. . . .

"We have also recognized, however, that the trier's discretion is not without limits. [T]he trier's freedom

to discount or reject expert testimony does not . . . allow it to arbitrarily disregard, disbelieve or reject an expert's testimony in the first instance. . . . [When] the [trier] rejects the testimony of [an] . . . expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief. . . . That said, given the myriad bases on which the trier properly may reject expert testimony and the reviewing court's obligation to construe all of the evidence in the light most favorable to sustaining the trier's [finding or] verdict, it would be the rare case in which the reviewing court could conclude that the trier's rejection of the expert testimony was arbitrary." (Citations omitted; internal quotation marks omitted.) *Menard* v. *State,* 346 Conn. 506, 521–22, 291 A.3d 1025 (2023).

Here, the habeas court never explicitly rejected the expert testimony of Kovera or Carlow. In the absence of such an explicit rejection of their testimony, we cannot conclude that the court rejected it or, if it did, that such a rejection was arbitrary. Rather, we presume that the court properly weighed all of the evidence presented to it in reaching its decision. The fact that the court came to a conclusion that was inconsistent with the expert testimony does not, in itself, support the petitioner's contention that the court arbitrarily disregarded that testimony. See *Evans* v. *Tiger Claw, Inc.,* 141 Conn. App. 110, 121 n.17, 61 A.3d 533 (2013) ("We presume that the court considered the relevant factors. . . . The correctness of a judgment of a court of general jurisdiction is presumed in the absence of evidence to the contrary. We do not presume error. The burden is on the appellant to prove harmful error." (Internal quotation marks omitted.)) Accordingly, the petitioner's claim is unavailing.

The judgment is affirmed.

In this opinion SUAREZ, J., concurred.