******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## JOSE LOPEZ *v.* COMMISSIONER OF CORRECTION
### (AC 46744)

Moll, Clark and Lavine, Js.

*Syllabus*

The petitioner, who previously had been convicted of murder, appealed following the denial of his petition for certification to appeal from the habeas court's judgment denying his habeas petition. He claimed, inter alia, that the court improperly concluded that his trial counsel, C, did not render ineffective assistance by failing to investigate and present the testimony of J, the petitioner's son, at the petitioner's criminal trial. *Held*:

The habeas court abused its discretion in denying the petitioner's petition for certification to appeal, as this court disagreed with the habeas court's reasoning in rejecting the petitioner's ineffective assistance claim with respect to J's testimony, and, accordingly, this court addressed the merits of the petitioner's claims, concluding that the issues were debatable among jurists of reason and that a court could have resolved the issues in a different manner.

The habeas court erred in concluding that C did not render ineffective assistance by failing to investigate and present the testimony of J, and, therefore, this court retained jurisdiction over the appeal and remanded the case to the habeas court to resolve the factual question of whether there was a reasonable probability that J's testimony exculpating the petitioner would have been credited by the jury if he had testified at the petitioner's criminal trial.

Argued November 12, 2024—officially released February 4, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Remanded*; *further proceedings*.

*James E. Mortimer*, assigned counsel, for the appellant (petitioner).

*Ford C. Liby*, certified legal intern, with whom were *Timothy F. Costello*, supervisory assistant state's attorney, and, on the brief, *Joseph Corradino*, state's attorney, and *Jonathan Formichella*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

CLARK, J. The petitioner, Jose Lopez, appeals from the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the habeas court (1) abused its discretion by denying him certification to appeal; (2) improperly concluded that the petitioner's trial counsel did not render ineffective assistance by failing to investigate and present the testimony of Jose Lopez III (Lopez III), the petitioner's son, at his criminal trial; and (3) improperly concluded that the petitioner was not prejudiced by his trial counsel's failure to investigate and present the testimony of Zeequan Groves at his criminal trial. We agree with the petitioner that the habeas court abused its discretion in denying him certification to appeal. We disagree with the habeas court's analysis of the petitioner's claim of ineffective assistance of counsel with respect to Lopez III, but we do not, in this opinion, disturb its judgment denying the petitioner relief on that claim. Instead, we remand the matter to the habeas court to resolve the factual question of whether, had Lopez III testified at the petitioner's criminal trial, there is a reasonable probability that his testimony exculpating the petitioner would have been credited by the jury. We retain jurisdiction over this appeal pending the remand and subsequent appellate proceedings. In light of our remand order on the petitioner's second claim, we leave his third claim for another day.

On the basis of the evidence presented at the petitioner's criminal trial, the jury reasonably could have found

the following facts, as set forth by this court in the petitioner's direct appeal. "For several months prior to October, 2010, the [petitioner] and [Lopez III] . . . were staying at the home of Ainsworth Barnes in Bridgeport. Ainsworth Barnes' son, Brandon Barnes (Barnes),[1] also resided in the house. On the morning of October 1, 2010, Barnes and the [petitioner] were at the house when Barnes received a cell phone call from [Lopez III]. [Lopez III] informed Barnes that he had been robbed on Barnum Avenue in Bridgeport. After speaking with [Lopez III], Barnes woke up the [petitioner] and told him that [Lopez III] had been robbed. Barnes also called his cousin, Jamar Watson, who was already on his way to the house, to inform him of the robbery. Barnes and the [petitioner] then went outside to start looking for [Lopez III]. Watson arrived at the house shortly thereafter.

"Barnes called [Lopez III] to determine his exact whereabouts, and then Barnes, Watson, and the [petitioner] went to find him. Watson drove himself and Barnes in a rental car, while the [petitioner] drove his black Mustang. They found [Lopez III] on Pixlee Street in Bridgeport, and he got into the [petitioner's] car. Watson, Barnes, [Lopez III], and the [petitioner] then began driving around the area looking for the people who had robbed [Lopez III]. [Lopez III] saw Shane Smith [the victim] walking down the street and called Barnes to identify [the victim] as one of the people who had robbed him. Watson and the [petitioner] parked their cars on the side of the road, and Watson, Barnes, [Lopez III], and the [petitioner] got out of the cars to pursue [the victim] on foot.

"[The victim] ran down the street, with Watson, Barnes, [Lopez III], and the [petitioner] in pursuit. The

---

[1] In this opinion, we refer to Ainsworth Barnes by his full name and to Brandon Barnes by his last name only.

group caught up to [the victim] in front of the Old San Juan bar on Barnum Avenue and assaulted him. At some point during the assault, [the victim] was thrown onto a car parked nearby. The car's alarm went off and the assault ended. [The victim] ran off and Watson, Barnes, [Lopez III], and the [petitioner] started walking back to their cars. While they were walking back, [the victim] began to taunt Watson. Watson and Barnes began to run back toward [the victim] to fight him again. The [petitioner] told them to stop and that he 'got [the victim] twice.' At that point, Barnes saw the [petitioner] holding a knife. Watson, Barnes, [Lopez III], and the [petitioner] then returned to their cars and drove back to Ainsworth Barnes' house. At the house, the [petitioner] stated for a second time that he had stabbed [the victim] twice. Watson testified that the [petitioner] said that he stabbed [the victim] 'where he . . . wouldn't die . . . .' Barnes testified that the [petitioner] said that he 'tried to get [the victim] where he wasn't gonna kill him.'

"[The victim] died later that day. Harold W. Carver II, the state's chief medical examiner, performed an autopsy on [the victim]. Carver found that [the victim's] 'heart muscle was too big for average' and that [the victim] had two stab wounds, one to his chest and one to the upper part of his stomach. The stab to [the victim's] chest resulted in 'a wound to the front wall of his heart and a very small amount of damage to one of the valves immediately behind that.' The stab wound to the chest was 'a very bad wound' and had caused [the victim's] death. Carver also testified that the large size of [the victim's] heart had '[p]robably not' contributed to the seriousness of the injury but that 'it may have played some component.'" (Footnote added.) *State* v. *Lopez*, 153 Conn. App. 864, 865–67, 105 A.3d 259 (2014).

On November 10, 2011, following a jury trial at which he was represented by Attorney Paul Carty, the petitioner was convicted of murder in violation of General

Statutes § 53a-54a (a), and acquitted of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a). On December 22, 2011, the court, *Hauser, J.*, sentenced the petitioner to forty years of incarceration. The petitioner appealed to our Supreme Court, which transferred the appeal to this court pursuant to Practice Book § 65-1. This court affirmed his conviction. See id., 865.

On April 16, 2018, the petitioner filed a petition for a writ of habeas corpus. He filed the operative one count amended petition on October 4, 2021. The petitioner claimed that Carty had rendered ineffective assistance by failing (a) to conduct an adequate investigation; (b) to adequately prepare and present a defense; (c) to present the testimony of Groves; (d) to investigate, interview, or present the testimony of Lopez III; and (e) to adequately cross-examine, impeach and otherwise challenge the testimony of Watson, Barnes, and Ainsworth Barnes.[2]

The habeas court, *Bhatt, J.*, held a trial on the petition on January 9, February 16 and May 1, 2023. The petitioner presented testimony from Carty, Watson, Lopez III, and Groves, and also testified on his own behalf. He also submitted forty-four exhibits into evidence.[3] The respondent, the Commissioner of Correction, submitted no exhibits and called no witnesses. Following

---

[2] The lettering of these claims corresponds to the order and manner in which they were presented in the operative petition.

[3] Two of the petitioner's exhibits, petitioner's exhibits 33 and 43, were surveillance videos from a store called Special Market near the scene of the incident, which had been state's exhibits 50 and 50A, respectively, at the petitioner's criminal trial. At the criminal trial, the state was unable to play state's exhibit 50 due to technical difficulties and marked state's exhibit 50A in its place. At the habeas trial, the habeas court was unable to view petitioner's exhibits 33 and 43 because they utilized proprietary software that was not provided to the court, and neither of the parties was able to open the videos or provide the software subsequent to trial. The parties stipulated that the habeas court could render a decision on the petition without viewing the videos.

the close of evidence, the petitioner withdrew claim (e) and filed a notice with the court in which he stated that his arguments would "focus on the issues related to [Groves] and [Lopez III], as specified in [claims (c) and (d)], and will include argument that the deficiencies related to Groves and [Lopez III] were a result of an inadequate investigation ([claim (a)]) and an inadequate preparation and presentation of the petitioner's defense ([claim (b)])."

On June 6, 2023, the habeas court issued a memorandum of decision denying the petition. The court concluded that Carty's decision not to investigate Lopez III's potential testimony did not amount to deficient performance and did not prejudice the petitioner. The court also concluded that, even assuming that Carty's decision not to call Groves at the petitioner's criminal trial amounted to deficient performance, the petitioner could not establish that it had prejudiced him. On June 20, 2023, the petitioner filed a petition for certification to appeal, which the court denied the following day.[4] This appeal followed. Additional facts and procedural history will be set forth as necessary.

[4] The petitioner had also filed a separate petition for certification to appeal on June 16, 2023, which raised various challenges to the habeas court's judgment, including a challenge to its ruling on his claim of ineffective assistance of trial counsel. Unlike the petition for certification filed on June 20, 2023, the petitioner did not file this earlier petition for certification through counsel. On June 21, 2023, the habeas court ruled that no action was necessary on the June 16, 2023 petition for certification, in light of its decision to deny the June 20, 2023 petition for certification that had been filed through counsel. On July 18, 2023, the petitioner, in a self-represented capacity, filed a motion to reconsider the habeas court's "no action necessary" order, in which he stated that he did not intend to continue utilizing the services of his habeas counsel, Michael Brown, on appeal and that he had severed his attorney-client relationship with Brown upon the denial of his habeas petition. That same day, the habeas court granted the motion to reconsider, vacated its "no action necessary" order, and denied the June 16, 2023 petition for certification. On appeal, other than the ineffective assistance of counsel claims discussed in this opinion, the petitioner has not raised any claims relating to the issues set forth in his June 16, 2023 petition for certification.

I

The petitioner first claims that the habeas court abused its discretion in denying his petition for certification to appeal. We agree.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the [denial] of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden,* 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden,* 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Vega* v. *Commissioner of Correction,* 224 Conn. App. 652, 657–58, 312 A.3d 1142, cert. granted, 349 Conn. 914, 315 A.3d 300 (2024).

For the reasons we set forth in part II of this opinion, although we do not reverse the habeas court's judgment in this opinion, we disagree with the reasoning of the

habeas court in rejecting the petitioner's ineffective assistance claim with respect to the testimony of Lopez III. We therefore conclude that the issues are debatable among jurists of reason and that a court could resolve the issues in a different manner. Accordingly, we turn to the merits of the petitioner's claims. See, e.g., *Cator* v. *Commissioner of Correction*, 229 Conn. App. 393, 402,      A.3d      (2024).

## II

The petitioner claims that the habeas court erred when it concluded that Carty did not render ineffective assistance by failing to investigate and present the testimony of Lopez III. He argues that Carty had no reasonable justification for failing to do so and that Lopez III would have provided noncumulative testimony that the petitioner did not stab the victim, such that his absence from the trial prejudiced the petitioner. We agree with the petitioner that Carty rendered deficient performance by failing to conduct any investigation into Lopez III's potential testimony. We further conclude that, had Lopez III's testimony exculpating the petitioner been credited by the jury, there is a reasonable probability that the result of the petitioner's criminal trial would have been different. Because, however, the habeas court made no findings as to whether Lopez III, had he provided this exculpatory testimony at the petitioner's trial, would have been credited by the jury, we conclude that the proper course at this juncture is not to reverse the habeas court's judgment, but to retain jurisdiction over this appeal and remand the case to the habeas court, *Bhatt, J.*, to resolve this factual question on the basis of the existing record and the habeas court's prior opportunity to observe Lopez III's testimony firsthand.

The following additional facts and procedural history are relevant to the petitioner's claim. Lopez III, the petitioner's adult son, was also arrested and charged

for his involvement in the victim's death and was represented by Attorney James Pastore. At the habeas trial, Lopez III testified[5] that, following the petitioner's criminal trial, he entered a plea of nolo contendere to aiding and abetting assault in the first degree and was sentenced to ten years of incarceration, execution suspended after four years, followed by three years of probation. Lopez III further testified that, while the petitioner's criminal case was pending, Lopez III informed Pastore three times that he wanted to testify on the petitioner's behalf, but that Pastore gave him no advice about whether he should do so and did not otherwise respond to his requests. Lopez III was never subpoenaed to testify, and did not testify, at the petitioner's criminal trial, nor did an investigator from Carty's office contact Lopez III prior to the petitioner's criminal trial.

Lopez III further testified that, had he been called to testify at the petitioner's criminal trial, he would have testified as follows. He observed the entire altercation with the victim. The altercation was a "quick minute thing." Barnes and Watson were the ones who did the fighting. Lopez III was positioned "a little bit more close up" to the altercation than the petitioner, who was behind Lopez III. The petitioner never struck the victim, and Lopez III never saw the petitioner do anything that would be consistent with a stabbing. Lopez III did not see anyone with a knife. Lopez III was scared and "in [his] own zone" after the altercation concluded and did not recall any discussions that had occurred after the incident, though he did remember returning to the Barnes' residence.

The petitioner testified at the habeas trial that, prior to his criminal trial, he discussed his case with Carty

---

[5] No documents from Lopez III's, Watson's, or Barnes' criminal cases were entered into evidence before the habeas court.

multiple times. During those conversations, Carty told him that it would be unnecessary to call any defense witnesses and that, because the state had the burden of proof, the petitioner could "fall asleep in [his] chair . . . ." The petitioner told Carty that he wanted Lopez III to testify on his behalf and explained to Carty that he thought it was important for Lopez III to do so because Lopez III had been standing next to the petitioner during the incident and could confirm that the petitioner had never touched the victim. Carty rejected this request, however, saying that Lopez III "was [the petitioner's] son and nobody's going to believe him." The petitioner explained that he did not press the issue further because he was "nonconfrontational" and "didn't want to get [Carty] mad."

Pastore did not testify at the habeas trial. Carty testified that, although he did not specifically recall "considering presenting or trying to present" Lopez III's potential testimony, he likely would not have pursued Lopez III as a witness because, "knowing that [Lopez III] had a pending case . . . I'm sure his lawyer wouldn't let him" testify. Carty explained that "typically, I know if someone wanted my client to testify in a case in which he was a codefendant, I would tell him, you know, you have a right to remain silent; use it." He was unable to recall whether he or his investigator had spoken with Pastore, saying only: "I may have, but that was over ten years ago." When asked whether he had thought about presenting Lopez III's testimony, Carty replied: "Did I think about it? And I dismissed it because he's a codefendant." Carty also recalled being surprised by the jury's verdict, explaining that after the trial concluded he wondered, "what trial was that jury watching?"

In its memorandum of decision, the habeas court found in relevant part that Lopez III would have testified at the petitioner's trial if called as a witness. The court

found that "Carty did not have a specific recollection of attempting to present Lopez III's testimony but, if there was a pending case, Carty would not take any action to attempt to contact him." The court further found that Carty had "dismissed the idea of calling Lopez III as a witness since he was a codefendant." The court also found that, when the petitioner asked Carty if he had asked his investigator to interview Lopez III and investigate him as a potential witness, Carty replied "that since Lopez III was [the petitioner's] son, he would not make a credible witness."[6]

The habeas court concluded that Carty's failure to investigate and present Lopez III's testimony did not

___

[6] In his appellee brief, the respondent argues that, due to Carty's at times hazy memory of his strategic decision-making with respect to Lopez III, the petitioner failed to meet his burden of establishing that Carty did not conduct any investigation into Lopez III's testimony. The respondent therefore asks us to disregard the habeas court's factual findings to the contrary—in particular, that Carty would have taken no action to contact Lopez III under the circumstances of this case, that Carty dismissed the idea of contacting Lopez III because he was a codefendant, and that he rebuffed the petitioner's request to investigate Lopez III. When reviewing a habeas court's denial of a claim of ineffective assistance of counsel, we are bound by the habeas court's factual findings unless they are clearly erroneous; see, e.g., *Roman* v. *Commissioner of Correction*, 223 Conn. App. 111, 119, 307 A.3d 934 (2023), cert. denied, 348 Conn. 952, 308 A.3d 1039 (2024); and the respondent points to nothing in the record that would undermine these findings. We therefore reject the respondent's argument.

In the alternative, the respondent argues that it would be inaccurate to say that Carty conducted no investigation into Lopez III because the fact that Carty knew—presumably by reviewing the case file and communicating with the petitioner—that Lopez III was the petitioner's son and had pending charges means that he must have conducted *some* investigation into Lopez III as a witness. We are not persuaded. Investigating a witness entails more than merely learning of their existence and basic information about their identity; it requires making a meaningful effort to ascertain what information that witness may be able to provide. See, e.g., *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 305–306, 267 A.3d 120 (2021) (counsel's decision not to contact or have investigator contact two potential witnesses who she knew were close family to her client was "decision not to investigate"); *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 33, 188 A.3d 1 (2018) ("[a]n attorney's duty of investigation requires more than simply checking out the witnesses that the client himself identifies" (internal quotation marks

constitute deficient performance. The court determined that, in light of the fact that Lopez III was a codefendant and represented by counsel, "[i]t [was] not unreasonable for [Carty] to not contact Lopez III to see if he would testify at the trial, while his own criminal case was pending." The court also determined that it was not deficient performance for Carty not to contact Lopez III because, had he taken the witness stand at the petitioner's trial, his credibility would have been challenged by the state due to his familial relationship to the petitioner. With respect to prejudice, the court concluded that there was no reasonable probability that Lopez III's presence at the trial would have altered the outcome because "the crux of [his] potential testimony—that [the petitioner] did not stab the victim—was already before the jury through several witnesses." In a footnote, the court added: "It is important to note . . . that [the petitioner] was also charged with accessorial liability."

"The sixth amendment provides that in all criminal prosecutions, the accused shall enjoy the right to the effective assistance of counsel. . . . This right is [made applicable] to the states through the due process clause of the fourteenth amendment. . . . *Strickland* [v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] . . . set[s] forth the framework for analyzing ineffective assistance of counsel claims. Under the two-pronged *Strickland* test, a [petitioner] can only prevail on an ineffective assistance of counsel claim if he proves that (1) counsel's performance was deficient, and (2) the deficient performance resulted in actual prejudice. . . . It is well settled that [a] court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong . . . ." (Citations omitted)), cert. denied sub nom. *Connecticut* v. *Skakel*, 586 U.S. 1068, 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019).

omitted; internal quotation marks omitted.) *Hickey* v. *Commissioner of Correction*, 329 Conn. 605, 617–18, 188 A.3d 715 (2018). "[W]e are mindful that [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 625, 212 A.3d 678 (2019).

A

We first consider whether Carty's failure to take any action to contact Lopez III amounted to deficient performance. The petitioner argues that none of the possible rationales Carty may have had for this omission stands up to scrutiny and that his failure to investigate Lopez III's potential testimony was "inexplicable and objectively unreasonable." We agree.

"To prove his or her entitlement to relief pursuant to *Strickland*, a petitioner must first satisfy what the courts refer to as the performance prong; this requires that the petitioner demonstrate that his or her counsel's assistance was, in fact, ineffective in that counsel's performance was deficient. To establish that there was deficient performance by the petitioner's counsel, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. . . . A reviewing court must view counsel's conduct with a strong presumption that it falls within the wide range of reasonable professional assistance. . . . The range of competence demanded is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 538–39,

138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016).

"The right to the effective assistance of counsel applies no less to the investigative stage of a criminal case than it does to the trial phase. . . . [Simply stated] . . . strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . That is, counsel's decision to forgo or truncate an investigation must be directly assessed for reasonableness in all the circumstances . . . . In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. . . . [D]eference to counsel's strategic decisions does not excuse an inadequate investigation . . . .

"Although the reasonableness of any particular investigation necessarily depends on the unique facts of any given case . . . counsel has certain baseline investigative responsibilities that must be discharged in every criminal matter. It is the duty of the [defense] lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case . . . . Thus, [a]n attorney's duty of investigation requires more than simply checking out the witnesses that the client himself identifies. . . .

"Of course, the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further

investigation would be a waste. . . . Because, however, [p]retrial investigation and preparation are . . . [key] to effective representation [by] counsel . . . counsel is not free to simply ignore or disregard potential witnesses who might be able to provide exculpatory testimony. . . .

"Similarly, a decision by counsel to forgo an investigation into the possible testimony of a potentially significant witness is constitutionally impermissible unless counsel has a sound justification for doing so; speculation, guesswork, or uninformed assumptions about the availability or import of that testimony will not suffice. Instead, counsel must seek to interview the witness to determine the value of any testimony that he may be able to provide. . . . In other words, counsel's anticipation of what a potential witness would say does not excuse the failure to find out; speculation cannot substitute for certainty." (Citations omitted; internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 32–35, 188 A.3d 1 (2018), cert. denied sub nom. *Connecticut* v. *Skakel*, 586 U.S. 1068, 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019).

"Regarding ineffectiveness claims relating to the failure to call witnesses, [w]hen faced with the question of whether counsel performed deficiently by failing to call a certain witness, the question is whether this omission was objectively reasonable because there was a strategic reason not to offer such . . . testimony . . . [and] whether reasonable counsel could have concluded that the benefit of presenting [the witness' testimony] . . . was outweighed by any damaging effect it might have." (Internal quotation marks omitted.) *Inglis* v. *Commissioner of Correction*, 213 Conn. App. 496, 531, 278 A.3d 518, cert. denied, 345 Conn. 917, 284 A.3d 300 (2022). Moreover, "our habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to

investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." (Footnotes omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 681–82, 51 A.3d 948 (2012).

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess [trial] counsel's assistance after conviction . . . and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citation omitted.) *Strickland* v. *Washington*, supra, 446 U.S. 689. Because "*Strickland* calls for an inquiry into the *objective reasonableness* of counsel's performance, not counsel's subjective state of mind . . . trial counsel's testimony may identify specific strategic or tactical reasons counsel had for the challenged action, but the habeas court is not confined to consider only those reasons identified. Rather, in all circumstances, the strong presumption of *Strickland* that counsel exercised reasonable professional judgment requires the habeas court to affirmatively entertain the range of possible reasons trial counsel might have had for the challenged action. . . . In sum, our plenary review requires us, first, affirmatively to contemplate the possible strategic reasons that might have supported [counsel's] decisions . . . and, second, to consider whether those reasons were objectively reasonable." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Jordan* v. *Commissioner of*

*Correction*, 341 Conn. 279, 290–92, 267 A.3d 120 (2021). We also, however, should not " '[indulge] post hoc rationalization for counsel's [decision-making] that contradicts the available evidence of counsel's actions . . . .' " (Emphasis omitted.) Id., 294, quoting *Harrington* v. *Richter*, 562 U.S. 86, 109, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); see also *Wiggins* v. *Smith*, 539 U.S. 510, 526–27, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (concluding that counsel "put on a halfhearted mitigation case" and that "the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing"); *Griffin* v. *Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not").

The record indicates that Carty may have had three distinct reasons for deciding not to contact Lopez III. First—on the basis of the petitioner's testimony at the habeas trial—Carty may have concluded that, because Lopez III was the petitioner's son, any investigation of his testimony would be fruitless because it was unlikely that a jury would consider him a credible witness. Second—on the basis of the petitioner's and Carty's testimony at the habeas trial—Carty may have concluded that it was unnecessary to investigate any potential defense witnesses because he believed that the state's case against the petitioner was weak. Third—on the basis of Carty's testimony at the habeas trial—Carty may have anticipated that, because Lopez III was facing his own charges stemming from the victim's death, Lopez III would invoke his privilege against self-incrimination and refuse to testify at the petitioner's trial.[7] We

---

[7] In his brief, the respondent argues that Carty also may have declined to investigate Lopez III because (1) Lopez III's testimony would have been cumulative to that of other witnesses, and (2) "the fact that Lopez III also

conclude that none of these justifications was objectively reasonable under the circumstances of this case.

1

First, Carty may not have contacted Lopez III because he believed that his status as the petitioner's son would

faced pending criminal charges in relation to the victim's death at the time of the petitioner's criminal trial also would have served to impeach the credibility of his testimony that limited the petitioner's (and by extension his own) criminal liability." We reject both arguments.

With respect to the first rationale proffered by the respondent, we disagree—for the reasons we set forth in part II B 2 of this opinion—that Lopez III's testimony was cumulative of other evidence in the case. Setting that analysis aside, however, the record reflects that Carty took no action to contact Lopez III to learn the details of what he would actually say. The petitioner, to be sure, testified that he told Carty that Lopez III was standing next to him during the altercation with the victim and could confirm that the petitioner had never stabbed the victim. There is no indication, however, that Carty ever attempted to flesh out this secondhand account of Lopez III's potential testimony by trying to ascertain additional details from Lopez III that would allow him to meaningfully assess whether Lopez III's eyewitness account would be cumulative of other evidence—such as how much and what exactly Lopez III saw, where he was looking, or how sustained his attention was. It would thus amount to post hoc speculation for us to assume, contrary to the record, that Carty had sufficient knowledge of Lopez III's potential testimony such that he could have concluded that it was cumulative of other evidence in the case. Moreover, if Carty did so conclude, without attempting to speak to Lopez III, such a conclusion would have been premature and unreasonable in the context of this case. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 35 ("[C]ounsel must seek to interview [a potentially significant] witness to determine the value of any testimony that he may be able to provide. . . . [C]ounsel's anticipation of what a potential witness would say does not excuse the failure to find out; speculation cannot substitute for certainty." (Citations omitted; internal quotation marks omitted.)).

With respect to the second rationale proffered by the respondent, it is unclear (and the respondent does not attempt to explain) how testimony by Lopez III tending to show that the petitioner did not stab the victim would have limited Lopez III's own criminal liability. Moreover, Carty's testimony in the habeas trial indicates that he was concerned that Lopez III would not testify in the petitioner's trial because his testimony would likely expose him to *greater* risk in his own criminal case. If we were instead to assume, as the respondent argues, that Carty believed that Lopez III would be subject to impeachment because his testimony would somehow *limit* his own criminal liability, such an assumption would contradict record

render him a witness who was not credible. The petitioner testified that Carty rebuffed his request to pursue Lopez III's testimony by saying, "that['s] [your] son and nobody's going to believe him." The habeas court likewise concluded that Carty did not perform deficiently in part because "[Lopez III's] credibility would have been challenged by the state due to his relationship with [the petitioner]." Although it is true, as a general matter, that a witness' close familial relationship to a party may give rise to bias; see, e.g., *State* v. *Asherman*, 193 Conn. 695, 719–20, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); we nonetheless conclude that it was unreasonable for Carty to dismiss Lopez III as not credible out of hand without even attempting to contact him to learn what he might have to say.

Determining whether a witness is credible entails a contextual, multifactor analysis, generally predicated on observation of that witness' conduct and demeanor, and an assessment of the witness' anticipated testimony in light of the other available evidence. As this court has explained, "[o]ur model jury instructions for criminal jury trials . . . recognize . . . that bias is only one of many factors that a trier of fact may rely upon in making a credibility determination. . . . As with other issues relevant to a witness' motive in, or reason for, testifying, any potential bias of a relative must be considered by the trier of fact in light of all the relevant circumstances." (Citation omitted.) *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 562 n.20; cf. *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 611 n.16, 103 A.3d 954 (2014) (cautioning that "the fact that a witness has a criminal background does not necessarily render his or her testimony not

---

evidence tending to show that Carty believed the exact opposite. We therefore reject this rationale, too, as an invitation to engage in impermissible post hoc speculation about Carty's decision-making.

credible"). Indeed, one reason that this court is prohibited from making credibility determinations is that our law recognizes that an appellate tribunal cannot reliably evaluate and weigh these factors without having had the opportunity to see the witness in question testify. See, e.g., *Adams* v. *State*, 259 Conn. 831, 842, 792 A.2d 809 (2002); *Feen* v. *New England Benefit Cos.*, 81 Conn. App. 772, 780, 841 A.2d 1193, cert. denied, 269 Conn. 910, 852 A.2d 739 (2004); see also *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 310–11, 112 A.3d 1 (2015) (appellate court did not usurp role of habeas court in evaluating substance of experts' opinions because habeas court's ultimate conclusion was not based on its superior position to evaluate opinions, as it made "no factual findings that derived from its ability to assess the credibility of the experts in light of their conduct and demeanor on the witness stand"); id., 355–56 (*Zarella, J.*, dissenting) (discussing state constitutional prohibition on appellate courts conducting credibility assessments).

Notwithstanding bias that may arise from a particular witness' family ties to a particular party, what is true of one family member is not necessarily true of another. This is evidenced by the many cases in which Connecticut courts have, in fact, credited the testimony of witnesses who were related to parties in the case. See, e.g., *Jordan* v. *Commissioner of Correction*, supra, 341 Conn. 299, 304–305 (sisters and niece); *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 528, 530, 198 A.3d 52 (2019) (sister); *Freitag* v. *Commissioner of Correction*, 208 Conn. App. 635, 654 n.12, 265 A.3d 928 (2021) (father); *Castaneda* v. *Lam-Castaneda*, Docket No. FA-22-5021606-S, 2024 WL 4541830, *3 (Conn. Super. October 18, 2024) (mother); *In re Haydee W.*, Docket No. 05-CP-12-020268-A, 2015 WL 6437229, *7 (Conn. Super. September 15, 2015) (aunt); *Austin* v. *Warden*, Docket No. CV-96-2172-S, 1996 WL 649328, *2

(Conn. Super. October 31, 1996) (sister). In light of the case-by-case and fact intensive nature of credibility determinations, we cannot conclude that it was reasonable for Carty to assume—without even attempting to contact Lopez III—that he would lack credibility as a witness solely because he was the petitioner's son. Indeed, it would have been difficult, if not impossible, for Carty to draw any reliable conclusions about Lopez III's credibility without first speaking to him, either directly or through an investigator, and hearing what he had to say.

The respondent cites several cases from this court and our Supreme Court for the proposition that Lopez III's familial relationship to the petitioner was a sufficient reason, standing alone, for Carty to discount his credibility. In all but one of those cases, however, counsel declined to call a witness—sometimes, though not always, due to credibility concerns stemming from that witness' status as a family member[8]—only *after* either conducting some investigation or having had prior experience with that witness. See *White* v. *Commissioner of Correction*, 209 Conn. App. 144, 158–59, 267 A.3d 289 (2021), cert. denied, 341 Conn. 904, 268 A.3d 78 (2022); *Bowens* v. *Commissioner of Correction*, 104 Conn. App. 738, 743–44, 936 A.2d 653 (2007), cert. denied, 286 Conn. 905, 944 A.2d 978 (2008); *Vines* v. *Commissioner of Correction*, 94 Conn. App. 288, 296–97, 892 A.2d 312, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006); *Dunkley* v. *Commissioner of Correction*, 73 Conn. App. 819, 824–25, 810 A.2d 281 (2002), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003). Moreover, the sole case cited by the respondent in which counsel was found not to

[8] In at least one of the cases cited by the respondent, the witness in question was not acquainted with the petitioner, and the opinion does not indicate that the petitioner and the witness were related in any way. See *Vines* v. *Commissioner of Correction*, 94 Conn. App. 288, 293–94, 892 A.2d 312, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006).

have performed deficiently when she failed to conduct any investigation into a family member witness—*Jordan* v. *Commissioner of Correction*, supra, 341 Conn. 279—is, in our view, distinguishable from the present case.

In *Jordan*, our Supreme Court considered whether the petitioner's trial counsel—who had died prior to the habeas trial—had rendered deficient performance by failing to conduct a proper investigation into six witnesses whose testimony, the petitioner alleged, would have supported a self-defense claim at trial. Id., 284, 303. Two of those witnesses were the petitioner's sister and his niece, who were eleven and eight years old, respectively, at the time of the shooting for which the petitioner had been prosecuted. Id., 299. Our Supreme Court concluded that it was reasonable to infer, given the testimony of the petitioner's sister and niece at the habeas trial, that his counsel had never contacted either of the girls to learn the substance of their anticipated testimony. Id., 305. The court nonetheless concluded that counsel's failure to investigate those two witnesses was reasonable. Id., 306–307. It set forth three reasons for this conclusion: first, that the petitioner's sister and niece were family members whose bias might have undermined their credibility; second, that they were young children at the time of the shooting; and third, that they had observed only the aftermath of the shooting, and, thus, their testimony would have been cumulative of, and not as compelling as, that of the state's chief eyewitness. Id.

The respondent would have us read *Jordan* to stand for the proposition that it is *per se* reasonable for counsel to assume that a potential witness would not testify credibly solely on the basis of the witness' family ties to his client and therefore decline to investigate that witness further. *Jordan* does not support such a sweeping rule. In *Jordan*, the witnesses' family ties to the

petitioner were one of multiple compounding factors—including their young age[9] and the fact that they were not eyewitnesses—that, together, our Supreme Court found provided a reasonable basis for counsel's decision to direct her investigative efforts elsewhere. Id. Neither of these additional factors exists in the present case: unlike the witnesses in *Jordan*, Lopez III was an adult at the time of the stabbing[10] and was present for the altercation with the victim. His potential testimony thus provided Carty a far more promising lead than that of two young children who could provide only after-the-fact accounts.

The conclusion that the respondent urges us to derive from *Jordan*—and the other case law he cites in his brief—cannot be reconciled with our Supreme Court's precedent on counsel's duty to investigate. In light of the fact intensive nature of the inquiry that credibility determinations require, a rule broadly excusing defense counsel from investigating a potentially exculpatory witness, solely on the assumption that his family ties to the defendant will render him not credible, would

---

[9] We note that this court recently stated in another case that counsel should have at least met with and interviewed potential alibi witnesses who were teenagers, notwithstanding any concern she may have had about the negative impact that calling minors as witnesses would have on the jury. See *Grant* v. *Commissioner of Correction*, 225 Conn. App. 55, 81–82, 314 A.3d 1, cert. granted, 349 Conn. 912, 314 A.3d 1018 (2024). But see id., 85–86 n.1 (*Prescott, J.*, concurring in part and dissenting in part) ("The majority is not entirely clear regarding whether [counsel's] failure to investigate or interview the other potential alibi witnesses amounted to deficient performance. . . . It is equally plausible . . . that the majority merely assumes deficient performance and rejects the petitioner's claim on the prejudice prong of *Strickland*." (Citation omitted.)).

[10] It is reasonable to infer that Carty knew Lopez III's age because, for example, the disclosures filed by the state and served on the defense during the pendency of the petitioner's criminal case contain Lopez III's date of birth and reflect that Carty received a recording of an interview that the petitioner gave to the Bridgeport Police Department on October 5, 2010, in which he stated that Lopez III was twenty years old. The fact that Lopez III had pending charges against him at the time of the petitioner's prosecution also would have supported an inference that he was an adult.

sanction "speculation, guesswork, or uninformed assumptions about the . . . import of that [witness'] testimony"—that is, constitutionally deficient performance. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 34–35.[11] In the absence of compounding circumstances similarly compelling to those present in *Jordan*, we read the case law of this court and of our Supreme

[11] The respondent's proposed rule also would put our case law at odds with the holdings of at least five federal circuit courts of appeals, as well as several of our sister states. See, e.g., *Brady* v. *Pfister*, 711 F.3d 818, 824 (7th Cir. 2013) ("the law does not demand, or even permit, the disregarding of [witnesses'] testimony just because they are close to the accused"); *Poindexter* v. *Booker*, 301 Fed. Appx. 522, 529 (6th Cir. 2008) (lawyer's dismissal of two prospective alibi witnesses on ground that judge would not find them credible because of their close relationships with petitioner was deficient performance because "alibi witnesses often have close relationships with the defendant"); *Soffar* v. *Dretke*, 368 F.3d 441, 474–75 (5th Cir.) ("This [c]ourt has squarely rejected the [proposition] . . . that a failure to interview a witness is excusable as a strategic decision if the witness would not have been credible . . . . [W]hile . . . a lack of credibility might support a strategic decision not to call a witness to *testify* at trial . . . a [witness'] character flaws cannot support a failure to *investigate*. Without so much as contacting a witness, much less speaking with him, counsel is ill-equipped to assess his credibility or persuasiveness as a witness." (Emphasis in original; internal quotation marks omitted.)), amended in part on other grounds, 391 F.3d 703 (5th Cir. 2004); *Pavel* v. *Hollins*, 261 F.3d 210, 214, 220 (2d Cir. 2001) (failure to investigate or call petitioner's mother as witness at criminal trial to provide exculpatory evidence was "error of extraordinary magnitude" when there was "simply no suggestion in the record that there was any reason not to put [her] on the stand"); *Lord* v. *Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("A witness who appears shifty or biased and testifies to X may persuade the jury that not-X is true . . . . But counsel cannot make such judgments about a witness without looking him in the eye and hearing him tell his story."), cert. denied sub nom. *Lambert* v. *Lord*, 528 U.S. 1198, 120 S. Ct. 1262, 146 L. Ed. 2d 118 (2000); see also *Syed* v. *State*, 236 Md. App. 183, 272, 181 A.3d 860 (2018) ("[T]he bottom line is that no reasonable evaluation of the advantages or disadvantages of [the witness'] alibi testimony . . . could be made without first contacting [the witness]. Only by contacting [the witness] would trial counsel have been able to determine . . . how credible [she] would appear to a jury . . . ."), rev'd on other grounds, 463 Md. 60, 204 A.3d 139 (2019), cert. denied,    U.S.    , 140 S. Ct. 562, 205 L. Ed. 2d 356 (2019); *State* v. *Kidder*, 150 N.H. 600, 605, 843 A.2d 312 (2004) ("[a]t a minimum, a lawyer must interview potential witnesses" (internal quotation marks omitted)); *People* v. *Williams*, 206 App. Div. 3d 1625, 1628, 168 N.Y.S.3d 613 (concern about witness' credibility due to his criminal record was not valid reason to eschew investigation), appeal denied, 38 N.Y.3d 1154, 194 N.E.3d 759, 174 N.Y.S.3d 52 (2022).

Court to stand for a more limited proposition: that counsel may validly refuse to call a witness on the basis of concerns about her bias as a relative when counsel has either investigated that witness' potential testimony or has otherwise had prior experience with that witness that has given him specific insight as to her credibility. Our conclusion is bolstered by the fact that, apart from *Jordan*, the respondent has cited no cases—and we are aware of none—in which this court or our Supreme Court has concluded that counsel's failure to conduct *any* investigation into a witness, due to credibility concerns stemming from her familial relationship to his client, was objectively reasonable. Cf. *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 625, 633 (counsel's failure to call petitioner's aunt as alibi witness was justified in part by concerns about her potential bias as relative, where counsel had interviewed aunt and determined that she could not account for petitioner's whereabouts during crime); accord *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 543–45; *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 546–48, 560–61 and n.20. Under the circumstances of the present case, any credibility concerns that Carty might have had stemming from Lopez III's status as the petitioner's son did not provide a valid basis for his failure to investigate Lopez III's potential testimony.

2

Second, Carty may have believed that any investigation of Lopez III as a potential defense witness was unnecessary because, in his estimation, the state's case was weak, and it would be unable to meet its burden of proof. Specifically, the petitioner testified at the habeas trial that Carty had told him that it would be unnecessary to call witnesses because the defense did not need to prove anything, and Carty testified that he was surprised by the jury's verdict, which suggests that he had

been confident in the fragility of the state's case. To the extent that Carty decided to forgo investigation into Lopez III on the basis of this belief, he did not act reasonably.[12]

"[C]ounsel has certain baseline investigative responsibilities that must be discharged in every criminal matter . . . [which include] explor[ing] *all avenues* leading to facts relevant to the merits of the case . . . ." (Emphasis added; internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 33. As this court has emphasized, "[a] reasonably competent defense attorney should want to know all of the evidence relating to the case—inculpatory and exculpatory—in order to make sound strategic decisions and effectively represent the client . . . ." *Grant* v. *Commissioner of Correction*, 225 Conn. App. 55, 76–77, 314 A.3d 1, cert. granted, 349 Conn. 912, 314 A.3d 1018 (2024).

The fact that these investigative duties are "baseline" means that they apply regardless of the strength of the state's case. Competent counsel would not forgo his fundamental duty to investigate potential defense witnesses on the assumption that he need not do so because (what he perceives to be) a weak prosecution case will fail, on its own, to persuade the jury. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 34 ("counsel is not free to simply ignore and disregard potential witnesses who might be able to provide exculpatory testimony"); accord *Pavel* v. *Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) ("[Trial counsel] decided not to prepare a defense for [his client] solely because he was

---

[12] The respondent does not argue that any perceived weakness of the state's case justified Carty's failure to contact Lopez III, nor did the habeas court so conclude. We nonetheless consider this rationale because it is our duty to affirmatively entertain and evaluate possible reasons that Carty may have had for his actions on the basis of the record before us. See *Jordan* v. *Commissioner of Correction*, supra, 341 Conn. 290–92.

confident that . . . the trial judge would grant [his] motion to dismiss the government's charges . . . . That [he] opted not to prepare a defense based entirely on this rationale militates strongly in favor of the conclusion that his representation of [his client] was constitutionally deficient."). It is entirely foreseeable, without the benefit of hindsight, that such a course of action may leave counsel unprepared to adequately challenge a state's case-in-chief that proves more compelling than anticipated. Simply put, counsel's belief that the state's case against the defendant is not strong does not relieve him from the duty to investigate potential defense witnesses.

3

Finally, Carty may have concluded that it would be fruitless to investigate Lopez III because he would likely invoke his privilege against self-incrimination and refuse to testify on the petitioner's behalf. Carty testified at the habeas trial that he believed Lopez III's attorney would not "let him" testify in the petitioner's trial because he was the petitioner's codefendant. The habeas court concluded that Carty's failure to contact Lopez III was reasonable in part because Lopez III was facing criminal exposure and was represented by counsel, stating: "It [was] not unreasonable for . . . Carty to not contact Lopez III to see if he would testify at the trial, while his own criminal case was pending." We disagree that this justification was a reasonable one.

As our Supreme Court made clear in *Skakel*, counsel may not forgo investigation of a potentially significant witness on the basis of "speculation, guesswork or uninformed assumptions about the *availability* or import of [the witness'] testimony . . . ." (Emphasis added.) *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 34–35. Because a witness' decision as to whether to invoke his privilege against self-incrimination bears on

his availability to testify; see, e.g., *State* v. *Pierre*, 277 Conn. 42, 68 n.10, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); Carty could not decline to investigate Lopez III's testimony on the assumption, in the absence of any information about Lopez III's wishes, that he would invoke that privilege. All that Carty knew, without conducting any investigation, was that Lopez III was represented by counsel and was facing charges stemming from the victim's death. These facts doubtless bore on the *legal advisability* of Lopez III testifying. Carty's knowledge of these facts was not, however, a substitute for knowing whether Lopez III actually *was willing* to testify, in a context where Carty had a constitutional responsibility to conduct an adequate investigation and pursue every avenue that might reasonably lead to exculpatory evidence. Compare *Burke* v. *Commissioner of Correction*, 90 Conn. App. 370, 379, 877 A.2d 885 (without testimony from petitioner's codefendant that he would have invoked fifth amendment privilege if asked to testify at trial, "[this court] cannot speculate that [he] would have invoked his privilege, and the petitioner has done nothing more than provide us with conjecture"), cert. denied, 275 Conn. 926, 883 A.2d 1241 (2005), and *State* v. *Cecarelli*, 32 Conn. App. 811, 818–19, 631 A.2d 862 (1993) (trial court was not entitled to rely on representation by witness' attorney that witness, with whom defendant alleged that he had participated in drug transactions, would invoke fifth amendment privilege if called by defendant to testify; court was instead required to hear from witness himself as to his intentions),[13] with *Robinson* v. *Commissioner of Correction*,

---

[13] In *State* v. *Young*, 258 Conn. 79, 91–93, 779 A.2d 112 (2001), our Supreme Court distinguished *Cecarelli*, holding that—when evaluating whether a witness was "available" for the purposes of a missing witness instruction—the trial court was permitted to conclude, without hearing directly from the witness, that the witness would likely invoke the privilege against self-incrimination on the basis of his pending charges stemming from the incident about which he would be called to testify. The court emphasized, however, that greater certainty as to the witness' intentions was required in a context,

129 Conn. App. 699, 703–704, 21 A.3d 901 (counsel's decision not to call witnesses, based in part on concern that they would invoke fifth amendment privilege, was not deficient performance where counsel previously had private investigator interview those witnesses), cert. denied, 302 Conn. 921, 28 A.3d 342 (2011).

The respondent, echoing Carty's testimony at the habeas trial, argues that it was reasonable for Carty not to investigate Lopez III's potential testimony because Pastore "would have declined to let [Lopez III] testify." This argument reflects a misunderstanding of the privilege against self-incrimination. "The privilege against self-incrimination is personal and may not be invoked on behalf of another." *State* v. *Smith*, 289 Conn. 598, 610, 960 A.2d 993 (2008), citing *Couch* v. *United States*, 409 U.S. 322, 327, 93 S. Ct. 611, 34 L. Ed. 2d 548 (1973). "While the personal nature of this privilege does not prohibit an attorney from claiming it on behalf of a client who is being interrogated in a civil matter, pursuant to General Statutes § 52-199 (b), no such statutory provision permits an attorney to claim the privilege on behalf of a client in a criminal matter." (Footnote omitted; internal quotation marks omitted.) *State* v. *Wilkes*, 37 Conn. App. 456, 461, 656 A.2d 1061 (1995), rev'd on other grounds, 236 Conn. 176, 671 A.2d 1296 (1996). Pastore certainly could have advised Lopez III against testifying in the petitioner's criminal trial, but the ultimate decision as to whether to do so would have been

such as that in *Cecarelli*, where a trial court's determination that a witness was unavailable would preclude the defendant from calling him, and thereby implicate his constitutional right to present a defense. Id., 93. We likewise conclude that, in the present case, where Carty's decisions as to which witnesses to investigate and call implicated whether the petitioner would receive the effective assistance of counsel to which he was entitled under the state and federal constitutions, Carty was not permitted to draw conclusions as to Lopez III's desire (or lack thereof) to testify simply on the basis of Lopez III's status as a codefendant; he was, rather, required to make some effort to ascertain Lopez III's actual intentions.

Lopez III's alone. Carty thus could not reasonably have presumed that Lopez III would invoke the privilege without making any effort to ascertain Lopez III's intentions on this score.

For the foregoing reasons, we conclude that the habeas court erred in concluding that Carty's failure to investigate the testimony of Lopez III did not constitute deficient performance.

### B

We next consider whether Carty's deficient performance prejudiced the petitioner. The habeas court concluded that the petitioner was not prejudiced because the "crux" of Lopez III's potential testimony—that the petitioner did not stab the victim—was cumulative of testimony that was already before the court through other witnesses. The habeas court also appeared to conclude, in a footnote, that, because the jury could have convicted the petitioner of murder as an accessory, there was no reasonable probability that Lopez III's testimony would have changed the outcome, as it tended to establish only that the petitioner was not the principal. We disagree with both of these conclusions. Because the habeas court did not draw a clear conclusion as to whether there is a reasonable probability that Lopez III's potential exculpatory testimony at the petitioner's criminal trial would have been credited by the jury, however, we conclude that the case must be remanded to the habeas court, *Bhatt, J.*, in order to make this determination on the basis of the existing record and the court's prior opportunity to observe Lopez III's testimony firsthand. We retain jurisdiction over this appeal, pending the remand and subsequent appellate proceedings.

### 1

We begin with a review of the record, including pertinent testimony, arguments of counsel, and jury instructions. The petitioner was charged with one count each

of murder and conspiracy to commit murder in connection with the victim's death. At the petitioner's criminal trial, the state presented no forensic evidence connecting the petitioner to the stabbing of the victim,[14] and, although the state introduced various surveillance videos of the area into evidence, none depicted the altercation with the victim.[15] The state's account of the altercation rested heavily on the testimony of four eyewitnesses. Those eyewitnesses were Brian Goodrich, a 911 caller who had been driving by the scene as the altercation was occurring; Michael Keegan, who was acquainted with the victim; Watson; and Barnes. The state also presented the testimony of Ainsworth Barnes, who had not witnessed the altercation but claimed to have been present for a subsequent conversation in which the petitioner confessed to the stabbing, and a videotaped statement by Groves, who did not testify.[16] Carty called one witness, Officer Benita Bailey of the Bridgeport Police Department, through whom

[14] Carver, the state's chief medical examiner who had performed the autopsy on the victim, testified as to the extent and nature of the victim's wounds but was unable to provide any information about the assailant other than that he possessed a knife.

[15] One of those surveillance videos was a video from a nearby store called Special Market; the habeas court was unable to view this video because it required proprietary software. See footnote 3 of this opinion. The parties, as discussed in footnote 3 of this opinion, stipulated that the habeas court did not need to review this video, in part because its contents were "adequately described in witness testimony from the criminal trial . . . ." The transcript of the petitioner's criminal trial reflects that the video from Special Market did not capture the altercation. At one point during her direct examination of Barnes, for example, the prosecuting attorney showed him the video from Special Market and asked: "What's going on that the jury cannot see at this point?" Barnes replied: "A fight."

[16] The state also presented testimony from several other witnesses, including various police officers, the owner of a convenience store, a supervisor in the Bridgeport 911 dispatch center, a paramedic, an inspector with the state's attorney's office and, as described in footnote 14 of this opinion, the state's chief medical examiner. None claimed to have witnessed the altercation with the victim or the petitioner's alleged statements taking responsibility for the stabbing.

he successfully introduced into evidence a dying declaration made by the victim.

Goodrich testified that, as he was driving by the scene, "[t]he first thing that caught [his] attention" was the sound of a car alarm. He turned to look out the driver's side window of his car and saw what he described as a "three or four on one fight" in which a man was "being bounced off of the hood" of a parked car. Goodrich also saw three spectators standing nearby, not doing anything. He did not observe the spectators cheering or otherwise encouraging the participants in the fight. He observed the man who had been bounced off the hood move to the front of the car, then to the parking lane, and then to the sidewalk, fighting with his attackers. Goodrich did not see any weapons. There was a vehicle lane between him and the scene—he estimated his distance from the altercation to have been between twenty-five and thirty feet—and there was traffic. He recalled that the altercation "happened quickly" and that he "didn't get [the] faces" of those involved; when asked, he was unable to identify anyone in the courtroom as having participated in the fight. Goodrich did not stop the car; he kept driving without looking back through his mirror. In total, he witnessed only about four or five seconds of the altercation, and he did not see how it ended. As he was driving, he called 911.

A recording of Goodrich's 911 call was admitted into evidence and played for the jury. In his conversation with the 911 dispatcher, Goodrich stated that he had seen four men "whupping ass on somebody else," and that the people fighting were Black.[17] He also told the dispatcher that he had seen a "couple of Hispanic spectators." In his testimony, however, Goodrich qualified the description of the fighters' races that he had given

---

[17] The record reflects, and the respondent does not dispute, that neither the petitioner nor Lopez III is Black, but that both Watson and Barnes are.

to the dispatcher, stating that, although he could say that the people fighting were not white, he could not positively say that they were Black.

Keegan testified that, on the day of the incident, he was smoking in a "cubby" area outside the Old San Juan bar when he heard "a lot of running . . . [and] commotion coming [his] way." He looked and saw "a bunch of youths" running toward him, one of whom was the victim. Keegan did not recognize any of these youths apart from the victim, and he did not even recognize the victim at first because he was running with his head down. Keegan believed that the youths were all Black males. Keegan observed somebody behind the victim "swinging over his head . . . ." Keegan moved out of the way—he estimated that the youths were about six feet away from him when they first approached him—and saw the victim run into the cubby area, where somebody "caught [the victim] . . . [r]ight in his face . . . ."[18] Keegan did not see any weapons but did see what looked like blood coming from the victim's mouth after he was hit. Keegan walked about ten steps in the opposite direction of the fight but then turned around to look again when he heard a slam and the sound of a car alarm. He saw the victim lying on the top of a car, with "a bunch of guys" standing around him. After a few minutes, the group broke up.

Keegan added that, on the day of the incident, he was not feeling "in the best of shape" because he had had too much to drink the night before. Keegan further stated that the altercation "happened so quick." He clarified that he had not seen all of the fight and that he had turned his back for a period of time. He also stated that he had not seen who slammed the victim

---

[18] At a later point in his testimony, however, Keegan stated that he could not say definitively that the victim was the person he had seen get punched in the face.

onto the car and added that "I don't know what happened when they were running towards me or what happened before that." Certain prior statements by Keegan also came into evidence through the testimony of a Bridgeport police officer, Lieutenant Christopher LaMaine, who had interviewed him. Lieutenant LaMaine testified that Keegan had told him that he had seen a "Black guy with a gray hoodie"[19] "swinging" at the victim and that everyone Keegan saw had "a role in [the] altercation . . . ."

Watson was incarcerated at the time he testified; he stated that he had pleaded guilty to a charge in connection with the victim's death but had not yet been sentenced. A condition of his plea was that he testify in the petitioner's trial, and he expected consideration from the state for his testimony.[20] Watson testified that, on the morning of the incident, Barnes called him to tell him that Lopez III had been robbed. Watson, Barnes, Lopez III, and the petitioner drove around the area of the altercation, where Lopez III pointed out the victim as one of the people who had robbed him. All four men started running toward the victim. Watson and Barnes caught up with the victim first and began "throwing fists at him . . . ." Watson stated that "[i]t was just, like, you know, happening so fast." He added that "I don't know how it happened, but [the victim] got slammed onto a car." He did not know who threw the victim onto the car and stated that "it was like a blur . . . ." He did not see all of the petitioner's, Barnes', or Lopez III's actions during the fight.

[19] The record reflects, and Lieutenant LaMaine conceded on cross-examination, that the petitioner was not wearing a gray hoodie at the time of the incident.

[20] At the habeas trial, Watson testified that he ultimately received a sentence of five years of incarceration, execution suspended after eighteen months, followed by three years of probation. When asked by the petitioner's counsel if he remembered "having an understanding coming from the state that [his] testimony would help [him] in [his] sentencing," Watson replied: "To a degree, but it was totally up to what the judge wanted to do."

Watson further testified that the fight concluded, and as Watson was walking away, the victim began taunting him. As Watson started running back toward the victim, the petitioner told Watson to stop, and the petitioner stated he "got [the victim] twice . . . ." Watson had not seen any weapons and did not have a weapon himself. He had not seen the petitioner stab or hit the victim but had seen the petitioner close enough to the victim to stab him during the fight. Watson stated that the four men went to Ainsworth Barnes' house, where the petitioner reiterated that he had stabbed the victim and stated that he would take the blame if the victim had died.

Barnes testified that he had pleaded guilty to a charge in connection with the victim's death prior to giving his testimony, but that he had not yet been sentenced. He denied expecting any benefit in return for his testimony. On the day of the incident, Barnes received a phone call from Lopez III and learned that Lopez III had been robbed. Barnes, Lopez III, Watson, and the petitioner went looking for the people who had robbed Lopez III. They encountered the victim, who "took off" when he saw them. Barnes and Watson caught up to the victim outside the Old San Juan bar and began hitting him. Barnes stated that the petitioner and Lopez III were "right along with me." Barnes' memory of the altercation was "kind of blurry," and he stated that, "at some point . . . [the victim] was thrown onto [a parked] car and the car alarm went off." Barnes stated that during the fight, he "wasn't really paying attention to who was doing what" because his emotions were running high. He estimated that the entire altercation lasted between one minute and one and one-half minutes, "if even that." Barnes did not see the petitioner participate in the assault on the victim. He did not see all of the petitioner's, Lopez III's, or Watson's actions during the altercation. Barnes acknowledged that when he was interviewed by police detectives, he told them that he had

a "tendency to black out" during fights. On the stand, however, he attempted to qualify this statement, saying that "black out" was "the wrong word" and that "I get emotionally involved [during fights] so I really don't think."

Barnes further testified, as had Watson, that, after the fight, the petitioner said that he had "got [the victim] twice." Barnes added that, at that point, he saw a knife in the petitioner's hand. Barnes acknowledged, however, that he had previously told the police that he had not seen the petitioner with a knife. Barnes was wearing glasses in the courtroom but stated that, on the day of the fight, he was not wearing glasses or contact lenses and that he has a "very bad sight problem." He was unable to make out the numbers on the clock in the courtroom, though he stated that the petitioner had been closer to him than the clock when he had seen the knife in his hand. Barnes testified that, after he, the petitioner, Lopez III, and Watson had returned to Ainsworth Barnes' house following the fight, the petitioner stated that he had "tried to get [the victim] where he wasn't gonna kill him" and said that he would "take the weight for this if worse came to worse."

Ainsworth Barnes testified that the petitioner, Lopez III, Watson, and Barnes returned to his house after the altercation and that, when Ainsworth Barnes asked what had happened, the petitioner said that he had "got [the victim] twice, poked him  .  .  .  ." The petitioner further stated that he would "take the weight if it comes down to it  .  .  .  ." Ainsworth Barnes observed the petitioner holding a knife and told Lopez III to throw it away. Ainsworth Barnes recognized the knife as one that he had given to Lopez III for his birthday. Carty pressed Ainsworth Barnes on whether he would falsely implicate the petitioner to protect Barnes, but Ainsworth Barnes stated that he would not lie to protect his son and said that, if Barnes had actually stabbed

the victim, he would expect Barnes to "step up and do the responsible thing  . . . ."

Groves, in his statement to the police, admitted that he had helped the victim rob a "little, short Puerto Rican kid" on the day of the altercation. The person whom the victim had robbed said that he was going to "murder this dude," and then made a phone call. Subsequently, a silver car arrived in the area, and the victim took off running. Groves claimed to have seen someone chasing after the victim with a knife; he described this person as tall, skinny, around twenty-seven years old,[21] and looking like a "Dominican person  . . . ." Later in his statement, Groves identified a person wearing gray as the person who had had the knife. Groves was in a nearby store when he saw the chase; he got scared and went to the back of the store. Groves stated that, "after when I went in the store, I don't know what happened after that."

Bailey testified that she had responded to the scene of the altercation and had encountered the victim lying face down on the floor of a nearby store, seriously injured. Although the victim was having difficulty breathing and his words were "a little garbled," Bailey was able to learn from him that he had had an "altercation with two Black males  . . . ." The victim did not say anything about Hispanic males. It was hard to understand the victim and he was "thrashing about" during his interaction with Bailey.

Midway through the trial, during a colloquy with the court outside the presence of the jury, the prosecutor stated that "the state's theory of the case is that the [petitioner] admitted to being the one who stabbed the victim." Consistent with this theory, the state's closing argument to the jury painted the petitioner as the perpetrator of the stabbing. In arguing that the petitioner had

---

[21] The petitioner was thirty-nine years old at the time of the offense.

the intent to kill, as required to support the charge of murder, the state argued that the petitioner had gotten "fired up" by the victim's robbery of his son and that, because the petitioner was "in the fight," he had the opportunity to kill the victim. The state further argued that the petitioner had intended to kill the victim because he was seen with a knife, because the victim's wounds indicated that the petitioner had stabbed the victim twice, once in the heart, because the petitioner "boasted" about having stabbed the victim and said that he would take responsibility for his death, and because the petitioner had taken a "leadership" role over his codefendants, who looked to him as a "father figure."

The state briefly discussed the theory of accessorial liability but nonetheless urged the jury to find the petitioner guilty as a principal, stating in relevant part: "If you don't believe the [petitioner] is the one who plunged the knife into [the victim], killing him, then you can consider that he was an accessory to the person who did. . . . Maybe that knife that ultimately ended up in his hands at Ainsworth Barnes' house, maybe it wasn't in the [petitioner's] hand when [the victim] was stabbed. The state would argue that it is. Just saying it's another theory of guilt that you can explore." After the defense gave its closing argument, the state delivered a rebuttal, which it concluded by stating: "The [petitioner] is guilty beyond a reasonable doubt of intending to kill [the victim], plunging a knife in his chest and his belly, with the intent to kill him, and he did. Thank you."

During jury instructions, the court stated in relevant part: "To be an accessory, a person must be more than simply present as a companion at the commission of the crime. One must do more than passively acquiesce to it or innocently do certain acts which in fact did aid in the commission of the offense. . . . He must also have had the same mental state and purpose necessary to be guilty of the crime as does the actual perpetrator."

We turn now to the habeas court's prejudice determination. The following legal principles are relevant to our review. "In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." (Internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 198 Conn. App. 345, 353–54, 233 A.3d 1106, cert. denied, 335 Conn. 948, 238 A.3d 18 (2020). However, "the standard for assessing prejudice under *Strickland* and the preponderance of the evidence standard are not the same. . . . [A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case . . . because [t]he result of a [criminal] proceeding can be rendered unreliable, and [thus] the proceeding itself unfair, even if errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." (Citation omitted; internal quotation marks omitted.) *Roberto A.* v. *Commissioner of Correction*, 229 Conn. App. 104, 118, 325 A.3d 1192, cert. denied, 350 Conn. 935, 327 A.3d 384 (2024). "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support . . . ." (Citation omitted; internal quotation marks omitted.) *Madera* v. *Commissioner of Correction*, 221 Conn. App. 546, 563, 302 A.3d 910, cert. denied, 348 Conn. 928, 305 A.3d 265 (2023). "[B]ecause our role in examining the state's case against the petitioner is to evaluate the strength of that evidence and not its sufficiency, we do not consider the evidence in the light most favorable

to the state. . . . Rather, we are required to undertake an objective review of the nature and strength of the state's case." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, 215 Conn. App. 322, 343, 282 A.3d 983, cert. denied, 345 Conn. 967, 285 A.3d 736 (2022).

With respect to accessorial liability, General Statutes § 53a-8 (a) provides in relevant part that "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct . . . ." "[A]ccessorial liability is predicated upon the actor's state of mind at the time of his actions, and whether that state of mind is commensurate to the state of mind required for the commission of the offense." (Internal quotation marks omitted.) *State* v. *Miller*, 95 Conn. App. 362, 371, 896 A.2d 844, cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006). In order for a defendant to be liable for murder as an accessory, the state must prove that he "(1) intended to aid the principal in the killing of the intended victim and (2) intended that someone be killed." *State* v. *Henry*, 253 Conn. 354, 360, 752 A.2d 40 (2000). "[A]ccessorial liability is designed to punish one who intentionally aids another in the commission of a crime and not one whose innocent acts in fact aid one who commits an offense. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate or consummate it." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 311 Conn. 408, 421, 87 A.3d 1101 (2014).

The record of the petitioner's criminal trial reflects that none of the state's four eyewitnesses was able to provide a complete account of the altercation from start to finish. Though both Barnes and Watson implicated the petitioner as the perpetrator of the stabbing, neither they, Goodrich, nor Keegan claimed to have actually seen the petitioner stab the victim. Barnes acknowledged that he "really [doesn't] think" during fights and that his memory of the fight was "blurry . . . ." Watson also stated that the fight was "like a blur" and was unable to account for certain moments of the fight, such as how the victim ended up on the hood of a parked car. Keegan turned his back at least once while the fight was occurring and, thus, witnessed only pieces of it, and Goodrich observed only four to five seconds' worth of the fight from the window of a moving vehicle on the opposite side of the street.

In this context, credible testimony from Lopez III—as he testified at the habeas trial—that he witnessed the *entire* altercation, that he did not see the petitioner stab the victim during that time, and that Barnes and Watson were the ones who fought the victim, would have significantly bolstered the petitioner's defense. Because no witness claimed to have actually seen the petitioner commit the stabbing, the jury—in order to believe that the petitioner had, nonetheless, stabbed the victim—would have had to conclude that he had done so at some point in the interstices of the four witnesses' testimony, where either their perception or memory of the altercation faltered. Lopez III's testimony, if believed by the jury, would have made this conclusion far more difficult to draw.

Lopez III's testimony also would have contradicted Barnes' and Watson's accounts in an important respect. Both Barnes' and Watson's testimony could reasonably be interpreted to place the petitioner within striking distance of the victim during the fight: Watson expressly

claimed that he had seen the petitioner close enough to the victim to stab him, and Barnes said that the petitioner and Lopez III were "right along with [him]" when he was assaulting the victim. Lopez III, however, stated that while he was "a little bit more close up" to the fighting, the petitioner was standing behind him—which the jury could reasonably have taken to mean that the petitioner was physically removed from the victim during the fight and could not easily reach him. Had the jury credited Lopez III's testimony exculpating the petitioner, it would have been harder for the jury to infer that the petitioner was capable of stabbing the victim.

The fact that the petitioner also was charged with accessorial liability does not diminish the value of Lopez III's potential testimony to the defense. Lopez III's testimony would not just have indicated that the petitioner did not stab the victim—it would tend to show that the petitioner had not participated in the fight *at all* and had instead stayed back from the altercation. As such, had the jury believed Lopez III's exculpatory testimony, it would have been more likely to have a reasonable doubt as to whether the petitioner—rather than being an accessory—was instead an "inactive companion" who did not share his codefendants' "community of unlawful purpose . . . ." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 311 Conn. 421. Moreover, in order for the jury to find the petitioner guilty of murder as an accessory, it would have had to find beyond a reasonable doubt that he intended to kill and aid in the killing of the victim. As the state's closing argument demonstrates, the evidence of the petitioner's intent to kill in this case was almost entirely evidence that tended to show that he was the individual who stabbed the victim, namely, the petitioner's alleged possession of a knife and after-the-fact confessions, and/

or evidence from which the state, *relying on the premise that the petitioner was the individual who stabbed the victim,* urged an inference of intent, namely, the wounds to the victim. Therefore, had the petitioner successfully raised a reasonable doubt through Lopez III's testimony about whether he was the person who stabbed the victim—which would have called into question the credibility of that evidence and the soundness of that premise—there is a reasonable probability that he would have thereby raised a reasonable doubt as to his intent to kill, making it more difficult for the jury to find him guilty under a theory of accessorial liability.

The potential significance of Lopez III's testimony is further amplified by the fact that the state's case against the petitioner was, on the whole, not particularly strong. The case hinged on testimony from three interested witnesses (Barnes, Watson, and Ainsworth Barnes) that the petitioner had admitted his guilt after the fact and had been seen holding a knife. There was no forensic evidence tying the petitioner to the stabbing, and the altercation with the victim was not captured on video. Of the four eyewitnesses who claimed to have seen the fight, all described it as a short, fast-paced altercation; all suffered from gaps in their perception or memory; and none claimed to have actually seen the petitioner stab the victim. The two disinterested eyewitnesses both identified the assailants as Black—which the petitioner is not, but Barnes and Watson are—either on the stand or in prior statements. The other two witnesses were the petitioner's codefendants. Both had pleaded guilty in connection with the victim's death and were awaiting sentencing; one acknowledged that he was expecting consideration from the state in exchange for his testimony. The other, the only eyewitness to the altercation who claimed to have seen the petitioner holding a knife, had previously told the police that he had not seen a knife and further testified that he had

a "bad sight problem" and had not been wearing glasses or contacts that day. Groves, who claimed to have observed the chase but not the fight itself, identified a person whom he estimated to be more than one decade younger than the petitioner as having had a knife. Finally, the victim's dying declaration identified "two Black males" as perpetrators of the assault but did not mention Hispanic males. Under these circumstances, we think that there is a reasonable probability that credible testimony from Lopez III that he observed the entire altercation; that he was closer to the altercation than the petitioner, who was behind him; and that he did not see the petitioner stab or strike the victim, would have raised a reasonable doubt as to the petitioner's guilt.

We therefore disagree with the habeas court's conclusion that Lopez III's absence from the criminal trial did not prejudice the petitioner because Lopez III's testimony would have been cumulative of that presented by other witnesses and because the petitioner could have been convicted of murder under a theory of accessorial liability.

3

We now turn to the scope of our remand. We have concluded that Carty performed deficiently in failing to investigate Lopez III's potential testimony and that, had Lopez III testified credibly at the petitioner's criminal trial, there is a reasonable probability that his testimony would have altered the outcome. Although the habeas court found that, if called, Lopez III would have testified at the petitioner's criminal trial, the habeas court did not draw a clear conclusion as to whether there is a reasonable probability that Lopez III's testimony exculpating the petitioner would, in fact, have been credited by the jury. At oral argument before this

court, the petitioner conceded that under such circumstances the case should be remanded to the habeas court for the purpose of making this determination, and we agree.

"When reviewing the decision of a habeas court . . . [t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Jolley* v. *Commissioner of Correction*, 98 Conn. App. 597, 599, 910 A.2d 982 (2006), cert. denied, 282 Conn. 904, 920 A.2d 308 (2007). In the present case, the habeas court's memorandum of decision does not include a clear finding as to whether there is a reasonable probability that the jury would have found Lopez III's exculpatory testimony credible had he been called to testify at the petitioner's trial. As an appellate tribunal, we may not make such a finding. In light of our review of the record and the conclusions we have set forth in this opinion, however, such a finding is necessary to determine whether the habeas court erred in resolving the petitioner's ineffective assistance claim with respect to Lopez III's testimony.

Practice Book § 60-2 (8) provides that this court may, upon its own motion or upon the motion of any party, "remand any pending matter to the trial court for the resolution of factual issues where necessary . . . ." We conclude that, in this case, a limited remand to the habeas court is appropriate so that it may resolve the question of whether—on the basis of the existing record and its prior opportunity to observe Lopez III's demeanor, conduct, and attitude—there is a reasonable probability that Lopez III's testimony exculpating the

petitioner would have been credited by the jury had he testified in the petitioner's criminal trial.[22] See, e.g., *Sease* v. *Commissioner of Correction*, 212 Conn. App. 99, 117, 274 A.3d 129 (2022); *Roger B.* v. *Commissioner of Correction*, 190 Conn. App. 817, 829–30, 212 A.3d 693, cert. denied, 333 Conn. 929, 218 A.3d 70 (2019), and cert. denied, 333 Conn. 929, 218 A.3d 71 (2019). Because Judge Bhatt presided over the petitioner's habeas trial and was the judge who had the opportunity to observe Lopez III testify, we order that he also make the finding that we order in this opinion.[23]

[22] The habeas court concluded that the petitioner was not prejudiced by Carty's failure to investigate Lopez III's potential testimony because the petitioner was charged with accessorial liability and because "the crux of [that] testimony—that [the petitioner] did not stab the victim—was already before the jury through several witnesses." This analysis is consistent with either (1) a finding that Lopez III's testimony at the petitioner's criminal trial would have been credible, or (2) an assumption, without deciding, that Lopez III's testimony at the petitioner's criminal trial would have been credible.

The respondent argues that the habeas court "suggested that it did not credit Lopez III's habeas testimony" because it noted in its memorandum of decision that "[Lopez III's] testimony at the habeas trial was made at a time when he was no longer facing any criminal liability." We disagree that this admittedly somewhat cryptic statement constituted an adverse credibility determination with respect to Lopez III. The habeas court made this observation in the context of analyzing the petitioner's claim of deficient performance, after it concluded that Carty had not performed deficiently by failing to contact Lopez III because he was facing charges and was represented by counsel and because he was the petitioner's son. Read in context, the habeas court appears to have pointed out Lopez III's lack of criminal exposure at the time of the habeas trial simply in order to draw a contrast between the circumstances that Carty confronted when deciding whether to call Lopez III as a witness at the time of the petitioner's criminal trial, and the circumstances that would inform an attorney deciding whether to call Lopez III as a witness today, in an attempt to "eliminate the distorting effects of hindsight . . . ." *Strickland* v. *Washington*, supra, 446 U.S. 689.

[23] General Statutes § 51-183c provides in relevant part that "[n]o judge of any court who tried a case without a jury in which a new trial is granted, or in which the judgment is reversed by the Supreme Court, may again try the case. . . ."

As our Supreme Court has made clear, however, "one way a reviewing court may remand a case to the original trial judge for additional proceedings without either triggering § 51-183c or a dispute over its application is by

The case is remanded to the habeas court, *Bhatt, J.*, to resolve the question of whether, had Lopez III testified at the petitioner's criminal trial, there is a reasonable probability that his testimony exculpating the petitioner would have been credited by the jury. This finding shall be made solely on the basis of the existing record and the habeas court's prior opportunity to observe Lopez III testify. This court retains jurisdiction over the matter pending the remand and subsequent appellate proceedings.

In this opinion the other judges concurred.

---

not disturbing the original judgment in any way and making clear that the remand is for the purpose of further factual findings." *Barlow* v. *Commissioner of Correction*, 328 Conn. 610, 614, 182 A.3d 78 (2018). Such is the course we adopt in the present case.